UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>          v.<br><br>ROSS B. SHAPIRO,<br>MICHAEL A. GRAMINS, and<br>TYLER G. PETERS,<br><br>                    Defendants. | Civil Action No.<br><br>JURY TRIAL DEMANDED |

# COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against defendants Ross B. Shapiro ("Shapiro"), Michael A. Gramins ("Gramins"), and Tyler G. Peters ("Peters"):

## SUMMARY

1.      This case is about material lies and omissions by Shapiro, Gramins, and Peters in buying and selling residential mortgage-backed securities ("RMBS"), and by Shapiro in trading manufactured housing asset-backed securities ("MHABS"), at Nomura Securities International, Inc. ("Nomura"), a broker-dealer.

2.      Hired in or about August 2009 as senior traders by Nomura, and assigned to the RMBS trading desk, Shapiro, Gramins, and Peters were responsible for arranging trades between customers, meaning that each would buy RMBS from one customer and then sell them to another customer. Shapiro was also responsible for arranging MHABS trades between customers in the same fashion as RMBS trades.

3.      At all relevant times, Shapiro was the head trader on the RMBS desk at Nomura and supervised the trading conducted by all of the desk's employees, including Gramins and Peters. Gramins and Peters were senior traders who, along with Shapiro, also directed subordinates in trading RMBS and interacting with customers.

4.      Beginning in or about January 2010 through in or about November 2013, Shapiro, Gramins, and Peters repeatedly lied to, or otherwise misled, customers about, among other things, the prices at which Nomura had bought and/or sold RMBS and MHABS and the amount of the firm's compensation for arranging the trades. Shapiro, Gramins, and Peters also misled customers about whether they were getting the best price for their RMBS and MHABS trades and how much money they were paying Nomura in compensation.

5.      In addition, Shapiro, Gramins, and Peters directed several employees on the RMBS desk at Nomura to engage in the same types of misconduct, by, among other things, coaching traders to lie during negotiations and, at times, instructing them as to the precise lies to tell customers in order to extract extra, concealed profits for Nomura from RMBS trades.

6.      The types of RMBS and MHABS at issue here[1] are generally illiquid and discovering an accurate market price for them is difficult. Participants trading in these RMBS or MHABS markets must rely on informal sources, including their broker, for this information.

7.      Nomura's customers typically owed fiduciary duties to their clients. Had Nomura's customers been aware that they could have paid less or received more for the RMBS and MHABS they purchased and sold, respectively, they would have made an effort to do so, because the price was material to Nomura's customers.

---

[1] The RMBS at issue in this case are known as non-agency or private label RMBS. Non-agency RMBS are backed by privately originated mortgages that are not guaranteed by the U.S. government.

8.      Shapiro, Gramins, and Peters engaged in this misconduct to earn more revenue for Nomura when trading RMBS and MHABS.  By both engaging in the misconduct directly, and directing subordinates to lie and mislead customers, Shapiro, Gramins, and Peters generated over $7 million in additional revenue for the firm.

9.      By engaging in the conduct alleged herein, Shapiro, Gramins, and Peters violated Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.  Based on these violations, the Commission seeks against each of them:  (1) entry of a permanent injunction prohibiting further violations of the relevant provisions of the federal securities laws; (2) disgorgement of ill-gotten gains, plus pre-judgment interest; (3) the imposition of a civil monetary penalty; and (4) such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

10.     The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)].

11.     This Court has jurisdiction over this action pursuant to Sections 20(b) and (d) and 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a),77v(c)]  and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

12.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa], because certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York.

13. In connection with the conduct alleged in this Complaint, Shapiro, Gramins, and Peters directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

14. Shapiro, Gramins, and Peters' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

15. Unless enjoined, Shapiro, Gramins, and Peters will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

## **DEFENDANTS**

16. Shapiro, age 41, is a resident of Irvington, New York.

17. Shapiro is currently associated as a registered representative with Nomura, where he began working in August 2009. Nomura placed Shapiro on administrative leave in November 2014. During the relevant period, Shapiro served as the head trader on Nomura's RMBS desk in New York, New York, and held the position of Managing Director, Fixed Income, Securitized Products Trading, Americas.

18. Gramins, age 33, is a resident of New York, New York.

19. Gramins was associated with Nomura, a broker-dealer, from approximately August 2009 to May 2015. He held the position of Executive Director, Fixed Income, Americas and was a senior trader on Nomura's RMBS desk in New York, New York.

20. Peters, age 32, is a resident of New York, New York.

21.     Peters was associated with Nomura, a broker-dealer, from approximately July 2009 to May 2015. He held the position of Executive Director, Fixed Income, Americas and was a senior trader on Nomura's RMBS desk in New York, New York.

## RELATED ENTITY

22.     Nomura, a New York corporation, has been registered as a broker-dealer with the Commission since 1969. Nomura is the U.S. affiliate of Nomura Holdings, Inc., a Japanese financial holding company with a principal place of business in Tokyo, Japan. Nomura is a member of the Financial Industry Regulatory Authority ("FINRA"), an organization that regulates member brokerage firms and exchange markets.

## FACTUAL ALLEGATIONS

**A.     Background**

23.     Shapiro, Gramins, and Peters were experienced RMBS traders who joined Nomura in or about August 2009, having worked together previously at another New York-based broker-dealer. An RMBS[2] is a type of security whose underlying assets are residential loans. (RMBS, which are debt instruments, are sometimes referred to as "bonds.") To create an RMBS, residential loans are typically bundled together, carved into various classes (or "tranches") that provide differing levels of risk and return, and then offered as securities to the investing public. RMBS investors receive payments from the interest and principal payments on the underlying mortgages. The price of an RMBS is expressed as a percentage of its par value. A price or level of "100" means that the RMBS is trading at 100 percent of its par value. Similarly, a price or level of "90" means that the RMBS is trading at 90 percent of its par value.

---

[2] MHABS bonds are structured exactly like RMBS bonds, except that they are based on loans issued for the purchase of manufactured housing (*i.e.*, mobile homes) rather than traditional homes. Moreover, both the trading practices and the market overall for RMBS, as described *infra*, are virtually identical to MHABS.

24. Many of the RMBS traded at Nomura had been discounted significantly since the financial crisis. Unlike traditional equity markets, the market for non-agency RMBS is largely opaque: there is no exchange that displays an instantaneous buy and sell price for each trade, and discovering a market price for these RMBS is therefore often difficult. While brokers (such as Nomura) are under no obligation to provide information to customers, in connection with their negotiations to purchase and sell RMBS, participants trading in the RMBS market often seek information concerning the purchase and sale price of RMBS from brokers.

25. As intermediaries, Shapiro, Gramins, and Peters provided market information to RMBS market participants and arranged RMBS trades (and in Shapiro's case, MHABS) between customers. To arrange trades, Shapiro, Gramins, and Peters communicated with customers interested in purchasing and selling RMBS and, when successful in arranging a trade, Nomura bought RMBS from one customer and then sold the same RMBS to another customer. In these circumstances, while Nomura typically briefly owned the RMBS in a principal account, it took minimal or no risk because it expected that it could re-sell the RMBS to another customer. Shapiro, Gramins, and Peters earned compensation for Nomura in these instances by re-selling the RMBS at a higher price and collecting the spread (or difference) between the purchase price and the sale price. The customers were aware that Nomura was compensated in this way, and the amount and source of the compensation to Nomura were often part of Shapiro, Gramins, and Peters' negotiations with customers around the purchase and sale of the RMBS.

26. Shapiro, Gramins, and Peters sometimes negotiated with customers an "all-in" price for an RMBS that incorporated both the purchase price for the security and Nomura's compensation; on other occasions, Shapiro, Gramins, and Peters and the customers separately, and specifically, negotiated the amount of Nomura's compensation, which would be in addition

6

to, or "on top of," a customer's acquisition price for an RMBS sold by Nomura (or, as the case may be, a reduction in the sale price to Nomura).

27. As was common practice in the RMBS industry, Nomura's traders and their customers often discussed the amount of Nomura's compensation in terms of the number of "ticks" that Nomura would receive on a trade. One "tick" equals 1/32 of a point. For example, a price of 65-16 refers to 65 and 16 ticks or $65^{16/32}$ (or 65.5).

28. Nomura's RMBS customers would often agree to pay compensation in an amount above the price at which Nomura was purchasing a security (a practice known as "pay on top"), and occasionally customers seeking to sell RMBS would agree to sell at a price below the price at which Nomura was able to sell the security to another customer, with Nomura collecting the difference. In these circumstances, the spread Nomura received was specifically negotiated with the buying or selling customer, respectively. In September 2011, Gramins told one of Nomura's largest customers that the "going rate" for "pay on top" compensation to Nomura was 8 ticks per trade. On other occasions, the traders and customers simply negotiated an "all-in" price for RMBS that incorporated both the purchase price for the security and Nomura's spread.

29. Nomura's customers were funds that invested in RMBS. The RMBS market operates through relationships between customers, who buy and sell the bonds, and broker-dealers, like Nomura, that arrange the trades. Customers seek to pay the lowest price for purchases and get the highest price on sales. It is not unusual for a customer's view of the current market price for a security to come primarily from the broker-dealer that is selling the security. Because of this, there is an emphasis on establishing relationships, building trust, and having a good reputation within the industry.

30. The misrepresentations by Shapiro, Gramins, and Peters about RMBS and MHABS were material to their customers' investment decisions. Had the customers known the true prices at which Nomura bought or sold RMBS and MHABS – rather than the misrepresented prices that Shapiro, Gramins, and Peters provided – many customers would have conducted their negotiations differently, including seeking better prices on trades, trying to re-negotiate trades, or even ceasing to do business with Nomura entirely.

B. The Defendants' Misconduct

31. From approximately January 2010 through at least approximately November 2013, Shapiro, Gramins, and Peters made misrepresentations to, or otherwise misled, customers on dozens of occasions about the bids and/or offers being provided to Nomura for particular RMBS or MHABS, the prices at which Nomura had purchased and/or sold RMBS or MHABS, and/or Nomura's compensation for arranging the trade (*i.e.*, the spread Nomura received between the purchase and sale prices).

32. For example, when Shapiro, Gramins, and Peters offered customers RMBS or MHABS, they regularly lied about how much Nomura had paid (or was going to pay) for the securities. In order to negotiate a higher sale price to the customers, Shapiro, Gramins, and Peters misled them into believing that Nomura had paid a higher price for the RMBS or MHABS than it actually had (or was about to).

33. In such cases, by misrepresenting Nomura's purchase price, Shapiro, Gramins, and Peters misled customers about the amount of compensation Nomura would receive on the transaction. For example, if one of the Defendants told a customer that Nomura's purchase price was 80 and offered a sale price of 80 and 4 ticks, the customer understood that Nomura would receive 4 ticks "pay on top" in compensation. However, if Nomura's purchase price was

8

actually 79 and the sale price was 80 and 4 ticks, then Nomura would receive an extra point in compensation as a result of the Defendants' misrepresentation.  On numerous occasions, customers explicitly agreed on the amount of Nomura's "pay on top" compensation – which the customers were directly paying to Nomura in the form of a higher price for the bonds – based on the purchase price as represented by Shapiro, Gramins, and Peters.

34.     In many cases, Shapiro, Gramins, and Peters' misrepresentations were made in electronic communications such as instant messages, emails, and online chats.

### *Examples of Shapiro's Lies to Nomura RMBS Customers*

35.     On December 14, 2011, Shapiro bought a large block of the bond GPMH 2000-3 IA from one Nomura customer ("Customer A") and sold the block to two other Nomura customers (split between them), one of which was Customer B.  During an extended negotiation via Bloomberg chat, Shapiro repeatedly lied to representatives of Customer A and Customer B about the other's offers and bids, respectively, as well as about how Nomura would get paid on the transaction.

36.     Among others, Shapiro told the following lies: (i) upon Customer B's representative telling Shapiro that he was willing to pay 87-00 for approximately 41% of the bond and agreeing to start with a bid of 86-00 (in response to Customer A's initial offer of 88-00), Shapiro falsely told the Customer A's representative that the bid was 83-00; (ii) having engaged in no further discussion with the Customer B's representative, three hours later Shapiro falsely told Customer A's representative the bid was now 84-16; (iii) while simultaneously discussing with Customer A's representative a potential counteroffer in the 86-00 or below range, Shapiro falsely told Customer B's representative that the counteroffer was 87-16; and (iv) upon suggesting to Customer A's representative that Shapiro could sell the whole bond for 85-

9

00, Shapiro told Customer A's representative that the sale price would be 85-00 to the acquiring counterparty (notwithstanding the fact that Customer B's representative told Shapiro it would pay 87-00 for approximately 41% of the bond), and Customer A would need to "pay on top" from there (in other words, cede a certain amount of ticks to Nomura by decreasing the sale price to Nomura).

37. As a result of Shapiro's lies, Nomura purchased the bond at 84-24 (which was .5 points (16 ticks) below what Customer A identified as the hoped-for price at the beginning of the negotiation), and sold the whole bond at 87-00. Nomura received the 2-16 spread (or 80 ticks) between the two prices' points. The Customer A representative, however, agreed to the terms of this transaction based on his false impression that Nomura only received a spread of 8 ticks on the transaction, as Customer A believed the bond was sold by Nomura at 85-00 (or 8 ticks more than the price at which Customer A sold it to Nomura).

38. Through his misconduct, Shapiro generated over $1.1 million in extra profit for Nomura on this trade.

39. In another example, on March 16, 2011, Shapiro falsely told Customer A's representative that Nomura had purchased two bonds that Customer A was interested in acquiring. Shapiro falsely told Customer A's representative that Nomura had purchased the bonds at 53-16 and 62-24, respectively, when in fact Nomura had bought them at 52-00 and 62-00. Shapiro then asked Customer A to "pay on top" an additional 8 ticks on both of these transactions, for a total of 16 ticks, to which Customer A agreed. As a result of these misrepresentations, Nomura sold the bonds to Customer A at 53-24 and 63-00, netting Nomura 56 and 32 tick spreads, respectively, equal to over $370,000 and $270,000 in additional gains for Nomura.

40.     Other transactions include additional instances where Shapiro lied about the price at which Nomura purchased a bond (and thereafter induced additional "pay on top") and about who owned the bond, which misrepresentations enabled Shapiro to induce a larger spread for Nomura.

### *Examples of Gramins' Lies to Nomura RMBS Customers*

41.     On March 16, 2011, Gramins reached out via Bloomberg to a representative of a Nomura customer ("Customer C"), soliciting a bid for the bond INDX 2005-AR14 A1B2 ("INDX").  After the Customer C representative opined that the bid amount should be 18, Gramins asked him:  "[C]an I talk you up?  [O]r can you firm up?"  Gramins further encouraged the Customer C representative to bid a higher amount for the bond, telling him:  "[T]his is where we look back and say can you believe we bought that at 19!"  The Customer C representative then agreed to "firm up" (*i.e.*, submit a definite bid) and asked Gramins to "use" a bid of 18-1 in Gramins' communications with the selling party.  Gramins replied:  "[Y]es, using[.]"  A short time later, Gramins confirmed that he had purchased the bond, without explicitly confirming the price at which he bought it, leading Customer C to believe Nomura purchased the bond at 18-1.  Gramins, however, in fact purchased the bond for Nomura at 17-17.

42.     Having been given a false impression, the Customer C representative then attempted to negotiate a "pay on top" amount with Nomura based on the fictional sale price, asking Gramins if they could "do something like 18-5 since low dollar [amount]?"  In other words, the Customer C representative offered to ultimately pay 18-5, with Nomura receiving a 4-tick spread.  Gramins replied that he would have been "happy to buy" the bond at a higher price and believed the bond could be "re-traded at 20 or better," and then asked "do you mind sticking w the qtr pt?" (i.e., 8 ticks), thereby again misrepresenting Nomura's purchase price.  The

11

Customer C representative agreed to compensate him accordingly. Rather than pay an 8-tick commission, however, Customer C actually paid Nomura a total of 24 ticks as a result of Gramins' misrepresentations, *i.e.*, 16 ticks more than the Customer C representative believed Customer C was paying.

43. As a result of his lies and omissions, Gramins generated over $97,000 in extra profit for Nomura on this trade.

44. In another instance, on January 25, 2012, Gramins reached out to a representative of a Nomura customer ("Customer D") and asked if Nomura could offer to sell a block of WMALT 06-AR6 2A ("WMALT") bonds that Customer D owned along with a block that Nomura owned and was looking to sell. The Customer D representative agreed that the firm would "tag along in the context of your 45.50 offering" – meaning, that the Customer D representative understood that both his firm and Nomura would offer to sell the bonds at 45-16 to any willing buyer.

45. Soon thereafter, Gramins told the Customer D representative that Nomura had a "44-16 bid" for WMALT and that he was "thinking of meeting [them] in the middle" between the 44-16 bid and their joint 45-16 offer. The Customer D representative inquired about how Gramins anticipated Nomura being compensated, to which Gramins replied "if you can pay[,] that would be best." Gramins thereafter continued to report on the negotiations with the potential buyer, ultimately suggesting to the Customer D representative "gonna tell [the potential buyer] 45 or the highway." Gramins next reported "ok[.] where you wanna sell em to me[?]," implying that Gramins had successfully arranged a trade with a buyer at 45-00. In reality, Gramins had arranged to sell a majority of the bonds held by Customer D at 46-16. The Customer D representative sought to confirm the sale price, asking "ok. done at 45?". Customer D also

12

inquired about Gramins' expectation as to compensation for Nomura, asking "where you want em?" In response, Gramins only said "44-24?", falsely confirming the supposed sale price of 45-00 and seeking 8 ticks in "pay on top" compensation. As a result of his misrepresentations, Nomura earned almost two full points on the majority of its trade with Customer D, for over $440,000 in extra profits for Nomura.

46.     Other transactions include additional instances where Gramins lied about the price at which Nomura purchased a bond (for example, telling Customer A that Nomura bought a bond at 48-00 when in fact it bought the bond at 47-16, and thereafter inducing additional "pay on top") and who owned the bond, as well as instances of lying to both sides in a transaction about the other sides' bids and offers, thereby inducing a larger spread for Nomura.

### *Examples of Peters' Lies to Nomura RMBS Customers*

47.     On March 18, 2011, Peters learned that Nomura had purchased a block of the bond JPMMT 2006-A3 2A1 at 71-08. Shortly thereafter, Peters contacted a representative of a Nomura customer ("Customer E") and falsely claimed that the bond was being offered at 75-24, implying that a third-party, and not Nomura, owned the bond. Peters then elaborated on the misrepresentation, saying that the "seller" (who did not exist) probably had "a little room" (meaning, to lower the price) but that the bond's price likely would not fall by more than a point. The Customer E representative directed Peters to "FOK" (short for "fill or kill," which is industry jargon for "last and final offer") at 74-24, to which Peters replied, "FOK worked!" By misleading the Customer E representative about the fictional bid from the phantom seller, Peters extracted over $117,000 in additional profits for Nomura.

48.     In a similar transaction, on January 12, 2012, Peters received a bid from a representative of a Nomura customer ("Customer F") to buy a block of NAA 2004 R2 A1

("NAA"). The Customer F representative instructed Peters to offer the seller "97-16." He also told Peters that he would "pay on top," meaning that he would pay Nomura an amount, yet to be agreed upon, above the price that Nomura ultimately paid for the securities on Customer F's behalf. Later that day, Nomura purchased the block of NAA from the seller at 97-01, and Peters received an e-mail confirming the details of the trade. After Nomura had acquired the securities, Peters communicated with the Customer F representative by chat, telling him "buying … 5.625mm NAA 2004-R2 A1 … seller appreciated us stepping up, gave us 8 ticks back. let us know where you want to write it." Peters' statement falsely implied that Nomura was buying the bond at 97-08 (i.e., 8 ticks below Customer F's 97-16 bid). The Customer F representative asked Peters point-blank "so you paid 97-08, right," and Peters falsely replied "yes." The Customer F representative told him to "use 97-18" and Nomura sold the securities to Customer F at that price. As a result of Peters' deception, the Customer F representative believed Nomura had paid 97-08 and agreed to give Nomura 10 ticks in compensation for intermediating the trade. In reality, Nomura actually earned 17 ticks and over $2,700 in additional profit.

49. Other transactions include additional instances where Peters lied about the price at which Nomura purchased a bond (and thereafter induced additional "pay on top") and who owned the bond, as well as instances of lying to both sides in a transaction about the other sides' bids and offers, thereby inducing a larger spread for Nomura.

### *Shapiro, Gramins, and Peters engaged in lies and omissions concerning the purchase and sale price of RMBS and MHABS on dozens of other occasions*

50. Beyond the transactions described above, Shapiro, Gramins, and Peters engaged in dozens of other lies and omissions concerning the purchase and sale price of RMBS and MHABS, including (but not limited to) during trades with numerous other customers in addition

to Customers A, B, C, D, E, and F.  These lies and omissions by Shapiro, Gramins, and Peters generated at least approximately $5 million in additional revenue for Nomura.

51. In addition, Shapiro, Gramins, and Peters trained, coached, and directed subordinates to engage in lies and omissions with customers, generating at least approximately $2 million in additional profits to Nomura.

52. In total, Shapiro, Gramins, and Peters' misconduct increased Nomura's revenue by over $7 million.

53. Nomura determined Shapiro, Gramins, and Peters' bonuses based on a variety of qualitative and quantitative factors related to their personal performance and the RMBS desk's performance as a whole, which included revenue generation.  During the years at issue, Nomura paid Shapiro, Gramins, and Peters at least $13.3 million, $5.8 million, and $2.9 million respectively in total compensation.

### First Claim for Relief
### (Violation of Section 17(a) of Securities Act)

54. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 53 above as if set forth fully herein.

55. By reason of the foregoing, Shapiro, Gramins, and Peters, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary to make the statements not misleading; or (c) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

56. By engaging in the conduct described above, Shapiro, Gramins, and Peters have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

### Second Claim for Relief
### (Violation of Section 10(b) of Exchange Act and Rule 10b-5)

57. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 53 above as if set forth fully herein.

58. By reason of the foregoing, Shapiro, Gramins, and Peters, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material fact(s) necessary to make

the statements made not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon certain persons.

59. By engaging in the conduct described above, Shapiro, Gramins, and Peters have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A. Enter a permanent injunction restraining Shapiro, Gramins, and Peters and each of their agents, servants, employees and attorneys and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

B. Require Shapiro, Gramins, and Peters to disgorge their ill-gotten gains, plus pre-judgment interest;

C. Require Shapiro, Gramins, and Peters to pay appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Securities Exchange Act [15 U.S.C. § 78u(d)(3)];

D. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,
/s/ Rua M. Kelly
Rua M. Kelly (Mass. Bar No. 643351)
James R. Drabick (Mass. Bar No. 667460)
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8941 (Kelly direct)
Facsimile:   (617) 573-4590
E-mail:  KellyRu@sec.gov

Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION

Dated:  September 8, 2015