UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

           v.

ROSS B. SHAPIRO, MICHAEL A. GRAMINS,
AND TYLER G. PETERS,

                  Defendants.

No. 1:15-cv-07045-RMB-JCF

**ORAL ARGUMENT REQUESTED**

**DEFENDANT TYLER PETERS' MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION TO DISMISS THE COMPLAINT**

ALSTON & BIRD LLP
Brett D. Jaffe
Joseph G. Tully
David C. Wohlstadter
Alston & Bird LLP
90 Park Avenue
New York, New York 10016
Tel:  212-210-9400

*Attorneys for Tyler Peters*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................3

ARGUMENT.......................................................................................................8

I.    THE COMPLAINT'S CONCLUSORY ALLEGATIONS AS TO UNIDENTIFIED
      "OTHER TRADES" FAIL TO COMPLY WITH RULE 9(B)'S HEIGHTENED
      PLEADING STANDARD ......................................................................................9

II.   THE COMPLAINT FAILS TO PLEAD THE EXISTENCE OF ANY MATERIAL
      MISSTATEMENT ........................................................................................11

      A.    Allegations Concerning How "Many Customers" Would Have
            Acted Are Insufficient ...........................................................12

      B.    The Complaint Does Not Allege that Customers Could Have
            Received a Better Price From Nomura....................................14

      C.    The Alleged Misstatements are Objectively Immaterial ..........................15

III.  THE COMPLAINT FAILS TO ALLEGE THAT MR. PETERS ACTED WITH
      SCIENTER ................................................................................................19

      A.    The Complaint Fails to Allege Mr. Peters' Motive to Commit
            Fraud.......................................................................................19

      B.    The Complaint Fails to Allege Conscious Misbehavior or
            Recklessness............................................................................21

            1.    The Complaint Fails to Plead that Mr. Peters Knew or
                  Should Have Known that the Allegedly Misrepresented
                  Facts Were Material ................................................................21

            2.    The Complaint Fails to Plead that Mr. Peters Knew or
                  Should Have Known His Statements Were False or
                  Misleading .................................................................................23

IV.   MR. PETERS CANNOT BE LIABLE FOR STATEMENTS MADE BY OTHERS................24

V.    THE SECTION 17(A) CLAIMS FAIL FOR THE SEPARATE REASON THAT MR.
      PETERS DID NOT OBTAIN MONEY OR PROPERTY ................................................25

CONCLUSION....................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995) ........................................................................ 18, 20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................... 9, 10, 13

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ................................................................................ 12, 22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................. 9, 10

*Birnbaum v. Newport Steel Corp.*,
    193 F.2d 461 (2d Cir. 1952) ........................................................................ 25

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) ............................................................................ 6

*Eaves v. Designs for Fin., Inc.*,
    785 F. Supp. 2d 229 (S.D.N.Y. 2011) ......................................................... 11

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ........................................................... 15, 18, 20

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994) ............................................................................ 9

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ........................................................................ 14

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ......................................................... 20

*Hutchison v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011) ........................................................................ 19

*In re Initial Pub. Offering Sec. Litig.*,
    358 F. Supp. 2d 189 (S.D.N.Y. 2004) ......................................................... 23

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ......................................................... 23

*In re Merrill Lynch Auction Rate Sec. Litig.*,
704 F. Supp. 2d 378 (S.D.N.Y. 2010), *aff'd sub nom. Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011) ..................................................................................11

*Janus Capital Grp. Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) ..........................................................................................24, 25

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ..............................................................................20, 21

*Lobaito v. Fin. Indus. Regulatory Auth., Inc.*,
No. 13 CIV. 6011 GBD HBP, 2014 WL 4470423 (S.D.N.Y. Sept. 9, 2014),
*aff'd sub nom. Lobaito, Jr. v. Fin. Indus. Regulatory Auth., Inc.*, 599 F. App'x
400 (2d Cir. 2015) ................................................................................................5

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ......................................................................passim

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
347 F. App'x 617 (2d Cir. 2009) ............................................................................9

*Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ..................................................................................14

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ....................................................................................9

*SEC v. Espuelas*,
579 F. Supp. 2d 461 (S.D.N.Y. 2008) ....................................................................14

*SEC v. First Jersey Sec. Inc.*,
101 F.3d 1450 (2d Cir. 1996) ..................................................................................25

*SEC v. Kelly*,
817 F. Supp. 2d 340 (S.D.N.Y. 2011) ....................................................................25

*SEC v. Landberg*,
836 F. Supp. 2d 148 (S.D.N.Y. 2011) ....................................................................19

*SEC v. Monarch Funding Corp.*,
192 F.3d 295 (2d Cir. 1999) ..........................................................................8, 11, 25

*SEC v. Pentagon Capital Mgmt. PLC*,
725 F.3d 279 (2d Cir. 2013) ....................................................................................8

*SEC v. Syron*,
934 F. Supp. 2d 609 (S.D.N.Y. 2013) ..............................................................21, 25

*SEC v. U.S. Envtl., Inc.*,
No. 94-cv-6608, 2003 WL 21697891 (S.D.N.Y. July 21, 2003), *aff'd*, 114 F.
App'x 426 (2d Cir. 2004) ................................................................................4

*SEC v. Wey*,
246 F. Supp. 3d 894, 910 ........................................................................9, 25

*Tabak v. Canadian Solar Inc*.,
549 Fed App'x 24 (2d Cir. 2013) ..................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*.,
551 U.S. 308 (2007) ......................................................................................21

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ................................................................................12, 14

*United States v. Litvak*,
808 F.3d 160 (2d Cir. 2015) ....................................................................13, 14

*United States v. Shapiro*,
3:15-cr-00155 (D. Conn.) ................................................................................3

*United States v. Vilar*,
729 F.3d 62 (2d Cir. 2013) ............................................................................13

*United States v. Walsh*,
194 F.3d 37 (2d Cir. 1999) ............................................................................13

*United States v. Weimert*,
819 F.3d 351 (7th Cir. 2016) .........................................................................16

**RULES**

Fed. R. Civ. P. 9(b) ...........................................................................9, 10, 11

**STATUTES**

15 U.S.C. § 78c(a)(4)(A) ......................................................................................4

15 U.S.C. § 78c(a)(5)(A) ......................................................................................4

44 U.S.C. § 1507 ..............................................................................................23

Securities Act of 1933 ............................................................................3, 8, 25

Securities and Exchange Act of 1934 .................................................3, 8, 24

**OTHER AUTHORITIES**

17 C.F.R. 240.10b-5 ............................................................................................... 3, 8, 25

17 C.F.R. 240.10b-10(a)(2)(ii)(A) .............................................................................. 22

75 Fed. Reg. 39 (Mar. 1, 2010) .................................................................................. 23

Defendant Tyler Peters respectfully submits this Memorandum of Law in support of his Motion to Dismiss the Complaint.

## INTRODUCTION

The Securities and Exchange Commission ("SEC") rushed to commence this action in September 2015, in conjunction with the unsealing of a criminal indictment against Mr. Peters in the District of Connecticut.  The SEC's haste shows in its threadbare complaint (the "Complaint"). The Complaint alleges, for example, that Mr. Peters told "dozens of lies" on "dozens of occasions" while trading residential mortgage-backed securities ("RMBS") at Nomura Securities International, Inc. ("Nomura") between 2010 and 2013.  But the Complaint does not provide a single detail about those "dozens of" transactions, with the exception of two trades—themselves described in a conclusory way that falls far short of the pleading standards for a securities fraud claim.  The SEC's pleading falls far short of what the law requires and should be dismissed.

The criminal action against Mr. Peters ended earlier this year, with Mr. Peters' complete acquittal on all charges asserted against him, including two counts of securities fraud based on the same conduct alleged here.  Undeterred by the absolute failure of the government's criminal case against Mr. Peters, the SEC presses ahead with this civil action.  The crux of the SEC's claim (just like the United States Attorney for the District of Connecticut before it) is that Mr. Peters, while negotiating principal-to-principal transactions with the most sophisticated hedge funds and investment funds in the world, committed securities fraud by misstating not the quality, value or characteristics of any security but rather (i) whether or not Nomura presently owned the bond it was selling to its highly sophisticated customers or (ii) the price at which Nomura previously bought the bond that it was now selling; in other words, that Nomura misrepresented the amount of profit it would make on the trade.  But that theory is fatally flawed, and the Complaint must be dismissed for at least the following reasons:

- **First**, the Complaint purports to assert claims under Section 10(b) and Section 17(a), each sounding in fraud, which fail to meet the heightened pleading standard of Rule 9(b). While the Complaint in the most general terms alleges that Mr. Peters engaged in misconduct in connection with some unspecified "other trades," the Complaint does not provide any detail about those trades or identify a single misstatement—material or otherwise—connected to those transactions. *See* § I, *infra*;

- **Second**, with respect to the alleged misstatements the Complaint does claim to identify, it fails to plead that a reasonable investor would have viewed the facts at issue as material to his or her investment decision. Instead, the Complaint speculates as to what some unknown and unquantified group of "many customers" would have done if they had known of such misrepresentations or if they had been aware better pricing was available in the market—even though the Complaint does not allege that any better price existed in the market. Moreover, the alleged misrepresentations affected the overall transactions to such a relatively minute degree that, as a matter of law, the Complaint fails to raise an inference that any reasonable investor would have viewed those statements as material. *See* §§ II (A), (B), *infra*;

- **Third**, the Complaint contends that, with respect to one of the two trades identified as related to Mr. Peters, he allegedly misrepresented the negotiating position of a third party, but no court in the Second Circuit has found such statements to be material and persuasive authority from the Seventh Circuit suggests they are not. *See* § II(C), *infra*;

- **Fourth**, the SEC has failed to adequately plead scienter. The Complaint contains no allegations from which to infer a motive for Mr. Peters to commit fraud because it never identifies a direct benefit he received as a result of his alleged conduct; instead, it alleges only that Nomura received additional revenue as a result of the transactions at issue and that this additional revenue might have been considered in some unspecified way when Nomura determined Mr. Peters' bonus. It is well-settled that such a general motive to improve corporate profits—common to every for-profit business in the world—is not enough to give rise to a securities fraud claim. *See* § III(A), *infra*;

- **Fifth**, the Complaint fails to allege facts from which to infer scienter by allegations of Mr. Peters' conscious misbehavior or recklessness. The SEC makes no allegation that Mr. Peters knew that misstatements about negotiating positions and Nomura's profit—all common in RMBS transactions—were not permitted in the context of the market in which he operated. Indeed, until an RMBS trader at a different bank was indicted in January 2013—long after the trades identified in the Complaint—no fraud claims had ever been predicated on the type of misstatements underlying the SEC's case. *See* § III(B), *infra*;

- **Sixth**, the Complaint purports to assert claims against Mr. Peters for the misstatements of others. But clear Supreme Court precedent expressly rejects such claims, absent allegations—none of which exist here—that Mr. Peters authored the statements at issue. *See* § IV, *infra*; and

- *Finally*, the claims asserted under Section 17(a) fail for the separate reason that the Complaint fails to allege that Mr. Peters obtained money or property as a result of the alleged misrepresentations.  *See* § V, *infra*.

For these reasons, and the others addressed below, the Complaint should be dismissed.

## BACKGROUND

The SEC commenced this action on September 8, 2015.  The Complaint names as defendants Ross Shapiro, Michael Gramins, and Tyler Peters, all former RMBS traders at Nomura. Compl. ¶ 1.  The Complaint purports to assert two causes of action against Mr. Peters: (1) violations of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), including Rule 10b-5 enacted thereunder, and (2) violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act").  *Id.* ¶¶ 2, 9.

**Mr. Peters' Acquittal in the Parallel Criminal Action.**  The SEC brought this action contemporaneous with the commencement of a criminal action prosecuted by the United States Attorney for the District of Connecticut.  *See* Indictment, *United States v. Shapiro*, 3:15-cr-00155 (D. Conn. filed September 3, 2015), ECF No. 2 ("September 2015 Indictment").  Indeed, on the same day that the SEC filed the Complaint, it issued a press release announcing that, in "a parallel action, the U.S. Attorney's Office for the District of Connecticut announced criminal charges against" Mr. Peters and two of his colleagues.  *See* Press Release, U.S. Securities and Exchange Commission, "SEC Charges Three RMBS Traders With Defrauding Investors" (Sept. 8, 2015). Those criminal charges included two counts of securities fraud asserted against Mr. Peters, based on conduct substantially identical to the allegations in the Complaint.  *See* September 2015 Indictment, ¶¶ 37-40.  Following a six-week jury trial in May and June of 2017, Mr. Peters was acquitted on all nine counts asserted against him, including both counts of securities fraud.  *See* Judgment of Acquittal, *United States v. Shapiro*, 3:15-cr-00155 (D. Conn. filed June 20, 2017), ECF No. 436; Verdict Form, *Shapiro*, No. 3:15-cr-00155, ECF No. 431.

*The Nomura RMBS Desk.*   Mr. Peters joined Nomura in 2009, after previously trading RMBS at Lehman Brothers and Barclays Capital.   Generally, the Complaint alleges that from January 2010 through November 2013, Defendants made material misrepresentations and omissions when trading RMBS at Nomura.   Compl. ¶ 4.   That trading occurred, the Complaint alleges, when Defendants "arranged trades" between buyers and sellers in the market for RMBS. Compl. ¶ 25.   The Complaint further alleges that Nomura acted as a "broker-dealer" in the RMBS market, interposed between buyers and sellers.[1]   Compl. ¶ 29.   Nowhere does the Complaint allege that Mr. Peters was acting as the agent for any of the counterparties with whom he traded, nor does it allege that Mr. Peters owed those counterparties any fiduciary duties whatsoever.

Unlike the other Defendants, Mr. Peters' role on the RMBS trading desk did not extend to the supervision of other traders.   Public records from the Financial Industry Regulatory Authority ("FINRA") reflect that Mr. Shapiro and Mr. Gramins each possessed a Series 24 supervisory license, which is required to supervise other traders on an RMBS desk.   *See SEC v. U.S. Envtl., Inc.*, No. 94-cv-6608, 2003 WL 21697891, at *2 (S.D.N.Y. July 21, 2003), *aff'd*, 114 F. App'x 426 (2d Cir. 2004).   In sharp contrast, because he never obtained a supervisory license, Mr. Peters did not, and could not, supervise other employees at Nomura.[2]

---

[1] Although the Complaint refers to Nomura as a "broker-dealer" (Compl. ¶ 29) and a "broker" (Compl. ¶ 24), the allegations relate to Nomura's role as a "dealer" and not as a "broker."  Under the securities laws, a "broker" is defined as "any person engaged in the business of effecting transactions in securities *for the account of others*." 15 U.S.C. § 78c(a)(4)(A) (emphasis added).  In contrast, a "dealer" is "any person engaged in the business of buying and selling securities . . . *for such person's own account* . . . ." 15 U.S.C. § 78c(a)(5)(A) (emphasis added).  There is no dispute that each and every trade at issue was executed by Nomura as principal.  Compl. ¶ 25.

[2] *Compare* FINRA BrokerCheck report for Tyler Gregory Peters, available at: https://brokercheck.finra.org/individual/summary/4826040#examsSection (Series 63 and Series 7 only), *with* FINRA BrokerCheck report for Ross Bennett Shapiro, available at https://brokercheck.finra.org/individual/summary/4260687#examsSection (Series 24 Supervisory license), *and* FINRA BrokerCheck report for Michael Albert Gramins available at

***The Alleged Misconduct.***   The allegations of misconduct here are remarkable more for what they omit than for what they include.  The Complaint contains no allegation whatsoever that Mr. Peters made any misrepresentation having to do with the quality or nature of the RMBS at issue.  This includes information about the expected cash flows, the default rates of borrowers whose loans back the securities, and borrower credit scores—all facts Mr. Peters knew were material and about which he knew he had a duty to be accurate.

Instead, with regard to the two trades where any detail is provided, the Complaint alleges that Mr. Peters made misstatements concerning (i) the negotiating positions of third parties, and (ii) what portion of the purchase price would constitute profit to Nomura, as opposed to an offset of Nomura's acquisition costs.  Most remarkably, the Complaint concedes that these allegedly "material facts" were ones that Mr. Peters had no duty to disclose.  Compl. ¶ 24.

<u>The 2011 Trade.</u>   In the first "example" described in the Complaint, the SEC alleges that, in March 2011, Nomura purchased a bond from one counterparty at a price of 71-08, and shortly thereafter, Mr. Peters offered that bond for sale to a different counterparty at 75-24 (the "2011 Trade").[3]  Compl. ¶ 47.  In so offering, the Complaint alleges that Mr. Peters "falsely claimed that the bond was being offered at 75-24, implying that a third-party, and not Nomura owned the bond." *Id.*  Although the Complaint alleges Mr. Peters falsely represented the *source* of the offer—in other

---

https://brokercheck.finra.org/individual/summary/4826040#examsSection (Series 24 Supervisory license).  Courts can take judicial notice of facts contained in official FINRA records. *Lobaito v. Fin. Indus. Regulatory Auth., Inc.*, No. 13 CIV. 6011 GBD HBP, 2014 WL 4470423, *10 (S.D.N.Y. Sept. 9, 2014), *aff'd sub nom. Lobaito, Jr. v. Fin. Indus. Regulatory Auth., Inc.*, 599 F. App'x 400 (2d Cir. 2015).

[3] As the Complaint explains, the "price of an RMBS is expressed as a percentage of its par value." Compl. ¶ 23.  "A price or level of '100' means that the RMBS is trading at 100 percent of its par value.  Similarly, a price or level of '90' means that the RMBS is trading at 90 percent of its par value." *Id.*  Prices can be described further as 90-01, or 90 and one "tick," which is equivalent to 90 and 1/32 of 1% of the bond's par value (or 90.01325%). *Id.* ¶ 27.

words, that Mr. Peters mislead the counterparty into believing that a third party, and not Nomura, owned the bond—*it does not allege that this offer was false*, *i.e.*, that the buyer could have paid a penny less than 75-24 when Mr. Peters made this statement.  The Complaint then alleges that Mr. Peters "elaborated" by saying the seller had "a little room" to negotiate, to which the buyer responded by "direct[ing] Peters to 'FOK'" or "fill or kill" at 74-24, meaning that both the customer's first and "last and final bid" to Nomura was 74-24.  *Id.*  But in fact, the actual transcript of this conversation makes clear that the purchaser did not direct Mr. Peters to do anything; rather, he simply asked Mr. Peters if Nomura would accept a best and final bid of 74-24 ("HOW ABOUT 74-24 FOK?").[4]  The buyer never showed any interest in the identity of the seller or the price at which Nomura was acquiring the bond.  Nevertheless, the Complaint concludes that Mr. Peters violated federal securities law "[b]y misleading the [buyer] about the fictional bid [sic] from the phantom seller . . . ."[5]  *Id.*  This "fictional bid," however, is not the price where the transaction occurred; in fact, the trade occurred one point below that offer, at 74-24, exactly the "FOK" price that the buyer suggested.  The Complaint does not—and cannot—allege that the buyer received anything other than the bond it wanted to buy at the price it wanted to pay.

The 2012 Trade.  The Complaint's description of the second "example" trade (the "2012 Trade") also fails to allege any misstatement about the quality or nature of the bond being sold.  Unlike the 2011 Trade, in which Mr. Peters is alleged to have negotiated with a counterparty to

---

[4] *See* Declaration of Brett D. Jaffe, dated Oct. 27, 2017 ("Jaffe Decl."), Ex. A.  Any facts described herein not reflected on the face of the Complaint are from electronic communications quoted in the Complaint.  Because those communications are "integral" to the Complaint, they may be considered on a motion to dismiss.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991).

[5] Note, although the Complaint refers to the seller's proposed price as a "bid," the SEC confuses the terminology used in the market.  In the parlance of the RMBS market, the term "bid" means a price proposed by a potential purchaser, and the term "offer" means a price proposed by the seller.

sell a bond that Nomura previously purchased from a third party, the 2012 Trade resulted from an auction process. In this version of an auction, a process called "Bids Wanted in Competition" or "BWIC," for short, a seller advises a number of dealers, including Nomura, that it wishes to sell a bond.[6] Nomura's traders then solicit bids from their customers for the bond being sold. If Nomura successfully purchases the bond in the auction, Nomura then, in turn, sells the bond to the customer who placed the order. In the case of the 2012 Trade, Mr. Peters' customer bid 97-16 plus "pay on top" (traditionally eight ticks), for a total of 97-24. Compl. ¶ 48. Nomura successfully purchased the bond in the BWIC for 97-01, fifteen ticks less than Mr. Peters' customer was willing to pay. According to the Complaint, Mr. Peters voluntarily told the customer that Nomura acquired the bond at a lower level than the customer's bid, offering to allow the customer to purchase the bond at a lower price than its initial bid. *Id.* ("buying … 5.625mm NAA 2004-R2 A1 … seller appreciated us stepping up, gave us 8 ticks back. let us know where you want to write it."). When the customer then asked about the price Nomura paid for the bond, Mr. Peters allegedly told the customer Nomura purchased at 97-08, seven ticks more than Nomura actually paid for the bond. *Id.* The customer, in turn, agreed to pay 97-18 total: 97-08, plus a premium to Nomura for securing the bonds. *Id.* Thus, in this allegedly "fraudulent" transaction, Mr. Peters delivered the bonds to his customer at an all-in price *less* than the customer was originally willing to pay (97-18 versus 97-24), and the customer only knew that Nomura purchased the bonds for a price below his bid because Mr. Peters told him, which Mr. Peters did not have a duty to do. This fraud, the Complaint alleges, netted Nomura (*not* Mr. Peters) a grand total of $2,700 in "additional profit." *Id.*

Other than those two trades, the Complaint makes sweeping, conclusory allegations. It alleges generally that "[o]ther transactions include additional instances" of Mr. Peters making

---

[6] *See* Jaffe Decl., Ex. B.

misrepresentations (Compl. ¶ 49), and that, "[b]eyond the transactions described above," defendants "engaged in dozens of other lies," generating additional revenue for Nomura.  Compl. ¶ 50.  The Complaint does not provide any detail about those unidentified transactions—such as when they occurred, the alleged misstatements, or the counterparties to those trades—or any clue as to which of those "other transactions" or "other lies" involved Mr. Peters.

Finally, the Complaint alleges that Defendants "coached, trained, and directed subordinates to engage in lies and omissions with customers," with Nomura capturing the "additional profits" that resulted from such conduct.  Compl. ¶ 51.  The Complaint contains no allegation as to who Mr. Peters coached or trained or when or how he coached or trained them.  Again, the Complaint leaves Mr. Peters guessing as to what number of those trades the SEC believes he participated in and his alleged role in those transactions, including what percentage of the "additional profits" the SEC might, in some manner, attribute to Mr. Peters' alleged conduct.

## ARGUMENT

To assert securities fraud claims under Section 10(b) of the Exchange Act, and Rule 10b-5 enacted thereunder, a plaintiff must plead that a defendant (1) "made a material misrepresentation or a material omission as to which he had a duty to speak . . . ;" (2) "with scienter;" and (3) "in connection with the purchase or sale of securities."  *See SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013).  Claims under Section 17(a) of the Securities Act share "essentially the same" elements of a fraud claim under Section 10(b), except that Section 17(a) limits its reach to the "offer or sale" of a security.  *See SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

## I. THE COMPLAINT'S CONCLUSORY ALLEGATIONS AS TO UNIDENTIFIED "OTHER TRADES" FAIL TO COMPLY WITH RULE 9(B)'S HEIGHTENED PLEADING STANDARD

A complaint will only survive a motion to dismiss if it alleges sufficient facts to cross "the line from conceivable to plausible." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 619 (2d Cir. 2009) (applying *Twombly* to Securities Act claims). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). The analysis "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then considering if non-conclusory allegations "plausibly suggest an entitlement to relief." *Id*. at 679. Mere "conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994).

Moreover, Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . ." This is even true for claims—like the Securities Act claims here—that typically require only that a plaintiff plead a defendant's negligence, so long as the claims "sound in fraud." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("while a plaintiff need allege no more than negligence [for certain Securities Act claims], . . . claims that do rely upon averments of fraud are subject to the test of Rule 9(b)"); *SEC v. Wey*, 246 F. Supp. 3d 894, 910 n.3 (S.D.N.Y. 2017) (applying Rule 9(b) to Section 17(a) claims because those claims sounded in fraud).

There can be little debate that all of the claims asserted in the Complaint "sound in fraud." The Complaint alleges that, with respect to the Securities Act and Exchange Act claims alike, Mr. Peters made materially false and misleading statements, either intentionally or recklessly, *i.e.*, not negligently. Among other things, the Complaint alleges—

- that "Peters *made misrepresentations* to, or otherwise *mislead*, customers" (Compl. ¶ 31) (emphasis added);

- that "*[b]y misleading* the Customer E representative about the fictional bid from the phantom seller, *Peters extracted* over $117,000 in additional profit from Nomura" (*Id.* ¶ 47) (emphasis added); and

- that "Peters, directly or indirectly, acting *intentionally, knowingly or recklessly*, [violated Section 17(a) and Section 10(b)]" (*Id.* ¶¶ 55, 58) (emphasis added).

Given these averments of fraud, to survive a motion to dismiss, the Complaint must meet the Rule 9(b) standard and, with particularity: (i) specify the fraudulent statements, (ii) identify the speaker, (iii) state where and when the statements were made, and (iv) explain why the statements were fraudulent. *See Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).

In this case, the SEC does not come close. The Complaint is rife with conclusory allegations, and, in summary fashion, alleges that (1) there are "[o]ther transactions . . . where Peters lied about the price" (Compl. ¶ 49); (2) "[b]eyond the transactions described above, [Defendants] engaged in dozens of other lies . . ." (*Id.* ¶ 50); and (3) "[Defendants] directed subordinates to engage in lies . . . ." (*Id.* ¶ 51). Indeed, the entire Complaint purports to describe a pattern of conduct in general terms, without offering any actual detail about the conduct that is alleged to be fraudulent. *See, e.g.*, *id.* ¶ 31 ("From approximately January 2010 through at least November 2013, . . . Peters made misrepresentations to, or otherwise misled, customers on dozens of occasions . . . ."); *id.* ¶ 32 ("For example, when . . . Shapiro, Gramins, and Peters offered customers RMBS or MHABS, they regularly lied . . . ."); *id.* ¶ 34 ("In many cases, . . . Peters' misrepresentations were made in electronic communications . . . ."). Such conclusory allegations, which offer no detail about the actual fraud alleged, run afoul of that which is required following *Twombly* and *Iqbal*, and fall far short of the requirements of Rule 9(b).

The sole exception that would permit this type of "pleading by example" does not apply here. Courts in the Second Circuit will permit such conclusory allegations of fraud only in the

limited instance when (i) the claims at issue concern a manipulative scheme and (ii) the defendant has exclusive control of the facts related to the alleged fraud.  *See In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 389-90 (S.D.N.Y. 2010), *aff'd sub nom. Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011) (dismissing conclusory allegations of fraud where false and misleading statements by financial advisors to investors "would not be solely within [the defendant's] knowledge").  Here, there are no such allegations.  Nor could there be: the SEC, through Nomura, had access (for years prior to filing the Complaint) to the Bloomberg chats reflecting the precise content of each and every trade Mr. Peters negotiated during the relevant time period.  The facts, to the extent they exist, reside squarely in the SEC's control.

Finally, the SEC's "bulk" pleading of fraud is improper because it fails to particularize and differentiate the alleged role and conduct of each individual defendant.  Allegations of misconduct that lump defendants together, without differentiating between their conduct, fail to satisfy Rule 9(b) because, in the Rule 9(b) context, it is axiomatic that "a plaintiff may not lump separate defendants together in vague and collective fraud allegations but must inform each defendant of the nature of his alleged participation in the fraud."  *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 247 (S.D.N.Y. 2011) (quotation omitted).

## II.   THE COMPLAINT FAILS TO PLEAD THE EXISTENCE OF ANY MATERIAL MISSTATEMENT

Courts will dismiss a complaint alleging securities fraud under Section 10(b) and Section 17(a) unless the alleged misrepresentation is "material."  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).  For a fact to be objectively material, "there must be a ***substantial likelihood*** that the disclosure of the omitted [or misstated] fact would have been viewed by the ***reasonable investor*** as having ***significantly altered*** the 'total mix' of information made available."

*Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (emphasis added).

The Complaint attempts to plead materiality through two sets of conclusory allegations. First, the Complaint alleges that "many customers" would have acted differently if they had known of the alleged misrepresentations.  Compl. ¶ 30.  Second, the Complaint alleges that customers would have also acted differently if they had "been aware that they could have paid less or received more" for the RMBS purchased or sold to Nomura.  Compl. ¶ 7.  Neither of these conclusory allegations finds support in the law or any particularized allegation of fact.  Additionally, a review of the Complaint's alleged misstatements, in the context of the transactions in which they occurred, suggests that the only plausible inference to be drawn is that the facts at issue were not material at all.

### A. Allegations Concerning How "Many Customers" Would Have Acted Are Insufficient

The "question of materiality, it is universally agreed, is an *objective one*, invoking the significance of an omitted or misrepresented fact to a *reasonable investor*" in making an investment decision.  *TSC Indus., Inc.*, 426 U.S. at 445 (emphasis added).  The Complaint's allegations fail to create any inference as to how the reasonable investor would view the alleged misstatements.  Instead, the Complaint alleges only that "had the customers known the true prices at which Nomura bought or sold RMBS []—rather than the misrepresented prices that Shapiro, Gramins, and Peters provided—*many customers* would have conducted their negotiations differently, including seeking better prices on trades, trying to re-negotiate trades, or even ceasing to do business with Nomura entirely."  Compl. ¶ 30 (emphasis added).

The fact that "*many customers*" would have acted differently tells us nothing about how the reasonable investor would have acted.  For example, the fact "many customers would have

conducted their negotiations differently" necessarily means that at least some customers, possibly even the majority, would not have conducted their negotiations differently.  By extension, this suggests that those customers would not have viewed the alleged misrepresentations as material. This allegation falls short of the Second Circuit's well-settled holding: a plaintiff must raise an inference of a "substantial likelihood that a reasonable investor would find the omission or misrepresentation important in making an investment decision."  *United States v. Vilar*, 729 F.3d 62, 92 (2d Cir. 2013).  There is no such inference to be drawn here.

The Second Circuit has addressed materiality in the context of allegations similar to those here in *United States v. Litvak*, a decision rendered several months after the SEC filed the Complaint.  *See* 808 F.3d 160, 175 (2d Cir. 2015).  That appeal followed the criminal conviction, after a jury trial, of an RMBS trader named Jesse Litvak.  *Id.* at 165.  Mr. Litvak contended that the misrepresentations he made to counterparties were immaterial as a matter of law.  *Id.* at 175. Based "on the trial record before" it, the Court of Appeals held that "a rational jury could have found that Litvak's misrepresentations were material."[7]  *Id.*  The trial record contained, the Second Circuit noted, "testimony from several representatives of Litvak's counterparties that his misrepresentations were 'important' to them in the course of the transactions on which the

---

[7] In *Litvak*, the Court of Appeals did not address the standard for pleading securities fraud. Moreover, even if it had, it would have addressed the allegations contained in a criminal indictment, not a civil complaint, which is governed by a looser pleading standard than a civil complaint—especially a civil complaint alleging fraud, like the one here.  *Compare United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (noting courts have "consistently upheld indictments that do little more than [] track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.") *with Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do," nor "does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement").

securities fraud charges were predicated . . . ." *Id.* at 175-76.  The Court of Appeals viewed that testimony as decisive, given the standard of materiality it articulated.  *Id.*

In sharp contrast, the Complaint contains no allegation that any particular investor—let alone the required objective "reasonable investor"—regarded any alleged misstatement by Mr. Peters to be important to his or her investment decision.  It is not "sufficient to allege that the investor *might have* considered the misrepresentation or omission important."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (emphasis added).  Indeed, the Second Circuit has reasoned that "while importance is undoubtedly a necessary element of materiality, importance and materiality are not synonymous."  *Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).  Regardless, the Complaint here fails to plead anything about the importance of any statements, and certainly fails to allege any particularized facts about how the misrepresentations "significantly altered the total mix of information."  *See TSC Indus., Inc.*, 426 U.S. at 449.

### B. The Complaint Does Not Allege That Customers Could Have Received a Better Price From Nomura

The Complaint's only other allegation with respect to materiality is that "[h]ad Nomura's customers been aware that they could have paid less or received more for the RMBS and MHABS they purchased and sold, respectively, they would have made an effort to do so, because the price was material to Nomura's customers."  Compl. ¶ 7.  No facts at all are alleged to support this conclusion.  *See SEC v. Espuelas*, 579 F. Supp. 2d 461, 469 (S.D.N.Y. 2008) (a plaintiff cannot "base claims of fraud on speculation and conclusory allegations.") (quotation omitted).  In the two trades the Complaint attributes to Mr. Peters, Nomura had purchased the relevant RMBS for its own account from a third-party seller before negotiations concluded with the eventual purchaser.  *See* Compl. ¶ 47 ("On March 18, 2011, Peters learned that Nomura had purchased a block of the

bond . . . . Shortly thereafter, Peters contacted a representative of a Nomura customer . . . ."); *id.* ¶ 48 ("After Nomura had acquired the securities, Peters communicated with the Customer F representative by chat, telling him 'buying . . . seller appreciated us stepping up, gave us 8 ticks back.  let us know where you want to write it.'").  The Complaint makes no allegation that Nomura would have, under any circumstances, sold those RMBS to the eventual purchaser for a penny less than it eventually did.  Similarly, the Complaint does not allege that any third-party counterparty in the RMBS market could have bought or sold the RMBS at prices more attractive than those offered by Nomura.  In other words, the Complaint contains nothing to support the conclusory allegation that any customers "could have paid less or received more" for the RMBS being transacted.  Thus, regardless of whether those customers would have negotiated differently if informed of a potential opportunity to pay less for a bond, or would have viewed that information as "important," there is no allegation that such an opportunity existed at the time of the trades attributed to Mr. Peters.

## C.  The Alleged Misstatements are Objectively Immaterial

Beyond the inadequacy of the Complaint's conclusory allegations of materiality, a review of Mr. Peters' alleged misstatements demonstrates that a reasonable investor would have viewed them as immaterial.  The facts allegedly misrepresented were: (i) the negotiating position of the seller, and (ii) Nomura's relativity insignificant "additional" profits.  There is simply no "substantial likelihood" that a reasonable investor would have viewed those facts as having "significantly altered the 'total mix' of information available" at the time of those trades.  *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  Indeed, each counterparty received the bond it wanted at the agreed upon price.

In the first trade attributed to Mr. Peters, the 2011 Trade, the only alleged misrepresentation concerns the negotiating position of a third party.  Compl. ¶ 47.  While no court in the Second

Circuit has addressed whether such a misrepresentation, on its own, constitutes a material misrepresentation, the Seventh Circuit Court of Appeals has persuasively held that statements concerning the fictitious negotiating positions of third parties are not "material."

In *United States v. Weimert*, the defendant was an employee tasked with selling his employer's asset.  819 F.3d 351, 353 (7th Cir. 2016).  After the defendant located a prospective purchaser, he falsely represented to his employer that the potential purchaser would only agree to the transaction if the defendant participated as an investor.  *Id.* at 365-66.  The defendant also mislead representatives of the purchaser into believing that his employer would only authorize the deal if the defendant was personally involved.  *Id.* at 364-65.  Believing that the only way to get the deal done was to involve the defendant, his employer agreed to pay him a bonus so he could participate in the deal, effectively lowering the final sale price received by the employer.  *See id.* at 353.  The Court of Appeals reversed the defendant's fraud conviction.  *Id.* at 370.  The Court of Appeals held that the alleged deception "would not have been material because it was deception of the opposing party in a transaction about the negotiating positions of third parties."  *Id.* at 365. The Court of Appeals noted that the misrepresentations did not concern the final consideration paid in the transaction or the nature of the asset.  *Id.* at 366.

As in *Weimert*, the 2011 Trade concerned the negotiating position of a third party.  The Complaint alleges, in conclusory fashion, that Peters "mislead[] the [buyer] about the fictional bid [sic] from the phantom seller."  Compl. ¶ 47.  But, there is no factual allegation in the Complaint that explains why the buyer would view the negotiating position or identity of the seller as a material factor in the buyer's ultimate decision to invest in the security.  *Id.*  Indeed, the portions of the chat quoted in the Complaint make clear that the buyer never acknowledged the existence of a third party, suggesting the identity of bond's owner was immaterial.  *Id.*

Notably, the sum total of the back-and-forth negotiation between Mr. Peters and the customer in the 2011 Trade was that the customer wound up paying a full point below Nomura's original offer.  *Id.*  The Complaint alleges Mr. Peters "falsely claimed that the bond was being offered at 75-24, implying that a third-party, and not Nomura, owned the bond."  *Id.*  In other words, the SEC alleges Mr. Peters told the purchaser that a third party would sell the bond to Nomura for 75-24.  *Id.*  But this makes no sense: all parties understood that if Nomura bought the bond at 75-24, the purchaser would have to pay more than Nomura's acquisition cost in order for Nomura to make money on the trade.  *Id.* ¶ 28.  But the parties did not negotiate a price for Nomura. Instead, the purchaser asked to buy the bond at a "best and final" price of 74-24 ("HOW ABOUT 74-24 FOK").[8]  *Id.* ¶ 47.  Mr. Peters responded, 'FOK worked!'" meaning the purchaser would, and did, pay 74-24 for the bond (and obviously knew Nomura paid less than 75-24).  *Id.*  The customer never inquired about the price Nomura paid or Nomura's profits on the trade.

With respect to the 2012 Trade, the Complaint alleges that Nomura earned $2,700 in "additional profit" (on a trade worth over $1.2 million) as a result of Mr. Peters' alleged misrepresentation as to the price at which Nomura purchased the bond it subsequently sold.[9]  *Id.* ¶ 48.  The misstatement here is immaterial for two reasons.  First, the final trade price was actually *less* than the customer's original bid, which was made before any alleged misstatement: the customer bid "97-16 . . . [and] told Peters that he would "pay on top[.]"  *Id.*  Applying the alleged

---

[8] *See* Jaffe Decl., Ex. A.

[9] The SEC alleges that, in the 2012 Trade, Nomura sold the bond for 97-18 (97.5625), after purchasing it for 97-01 (97.03125).  Compl. ¶ 48.  The 97.5625 sale price, less the 97.03125 purchase price, resulted in a spread of 0.53125% of par value (97.5625 - 97.03125 = 0.53125%). The SEC alleges that the customer agreed to pay 10 ticks (0.3125) "commission," so this is subtracted to find the "additional profit" Nomura earned, which results in 0.21875% (0.53125 - 0.3125 = 0.21875%).  Combining 0.21875% with the allegation that Nomura earned "$2,700 in additional profit," the total transaction was over $1.2 million ($2,700 / 0.21875% = $1,234,285).

"going rate" for pay on top of eight ticks (Compl. ¶ 28), this means the original bid was 97-24.[10] The final trade occurred at 97-18—six ticks *less* than the original bid—and the customer only learned Nomura paid less than the customer's bid because Mr. Peters voluntarily told him.  Compl. ¶ 48.  This hardly suggests an inference that the transaction was tainted by fraud.

Second, the core question is whether the statement "significantly altered the 'total mix' of information available."  *ECA*, 553 F.3d at 197 (citations and internal quotation marks omitted). By its very definition, that standard focuses on the relative significance of the alleged misstatements, and the Second Circuit has held that an alleged misstatement with a relatively small impact, on a percentage basis, is immaterial as a matter of law.  *See ECA*, 553 F.3d at 204 (noting threshold of 5% is a "good starting place for assessing the materiality of the alleged misstatement" and that a misrepresentation that affects "less than one-third of a percent of total assets does not suggest materiality").

Here, Mr. Peters' alleged misstatement in the 2012 Trade also falls far short of the Second Circuit's 5% guideline.  The alleged effect of the misrepresentation is 0.22% of the total $1.2 million transaction price.  Such a trivial impact is immaterial as a matter of law.  *See id.*; *see also Acito v. IMCERA Grp., Inc*., 47 F.3d 47, 51–52 (2d Cir. 1995) (holding misrepresentation of "less than 1%" immaterial as a matter of law).  Similarly, the 2011 Trade involved assets valued at over $3.6 million and generated an alleged "additional" $117,000 in revenue for Nomura, according to the Complaint, or 3.25% of the total transaction value; again, the alleged misrepresentation is immaterial amount as a matter of law.[11]  *See Hutchison v. Deutsche Bank Sec. Inc*., 647 F.3d 479,

---

[10] The initial bid of 97-16, plus 8 ticks "pay on top," equals 97-24 (97-16 + 08 = 97-24).

[11] The 74.75 sale price, less the 71.25 purchase price, plus 8 ticks "standard commission."  The Complaint alleges that Nomura bought the bonds at 71.25 and sold them at 74.75, resulting in a spread of 3.5% of par value (74.75 - 71.25 = 3.5%).  The SEC contends that the standard

489 n.5 (2d Cir. 2011) (holding statement that misrepresented portfolio's assets by 3% "presumed to be quantitatively immaterial"). This quantitative analysis serves as a persuasive benchmark that, in the absence of any alleged qualitative factors tending to show materiality, warrants dismissal. *See id.* at 488-89 (dismissing case where "quantitative approach" revealed impact was under 5% and plaintiff failed to allege qualitative factors demonstrating materiality).

## III.   THE COMPLAINT FAILS TO ALLEGE THAT MR. PETERS ACTED WITH SCIENTER

In order to state a claim for securities fraud, a plaintiff must plead the defendant's scienter by alleging "facts that give rise to a strong inference of fraudulent intent." *SEC v. Landberg*, 836 F. Supp. 2d 148, 154 (S.D.N.Y. 2011) (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). A strong inference of fraudulent intent may be established by alleging facts that (i) "show that defendants had both motive and opportunity to commit fraud," or (ii) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (quoting *Novak*, 216 F.3d at 307). The Complaint alleges neither.

### A.  The Complaint Fails to Allege Mr. Peters' Motive to Commit Fraud

With respect to Mr. Peters' alleged motive to commit fraud, the Complaint offers only conclusory allegations that, as a result of Mr. Peters' alleged conduct, Nomura's revenue increased and that increase in revenue would eventually trickle down to Mr. Peters at some point in the future. Compl. ¶¶ 52-53. How that revenue would trickle down to Mr. Peters is unclear, as the Complaint describes the incentive compensation scheme at Nomura in only the most general terms: "Nomura determined . . . Peters' bonuses based on a variety of qualitative and quantitative factors

---

commissions is 8 ticks or 0.25 (Compl. ¶ 28), so this must be subtracted out to find the "additional profit" Nomura earned, which results in 3.25% (3.5 - 0.25 = 3.25%). Combining 3.25% with the allegation that Nomura earned "$117,000 in additional profit" reveals that the total transaction amount was $3.6 million ($117,000 / 3.25% = $3,600,000).

related to [his] personal performance and the RMBS desk's performance as a whole, which included revenue generation." Compl. ¶ 22. Indeed, this allegation essentially describes the compensation of every employee of a for-profit enterprise in the United States who receives a bonus as part of his or her compensation.

It is well-settled in the Second Circuit that an alleged motive to increase corporate profits and, thereby, a defendant's compensation—a motive "possessed by virtually all corporate insiders"—fails to allege the type of motive required to plead scienter under the federal securities laws. *Novak*, 216 F.3d at 307; *Tabak v. Canadian Solar Inc.*, 549 Fed App'x 24, 29 (2d Cir. 2013) ("the general motivation to act in one's own economic self-interest is insufficient to allege motive."); *Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001). Instead, a plaintiff must show that a defendant "**benefitted in some concrete and personal way** from the purported fraud." *Novak*, 216 F.3d at 307-08 (emphasis added). Generalized allegations of increased compensation will not suffice; a "plaintiff must allege a ***unique connection*** between the fraud and the [benefit]." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 586 (S.D.N.Y. 2011) (emphasis added, citation omitted). Consistent with this settled authority, the Second Circuit has routinely rejected scienter allegations substantively identical to those before the court here, *i.e.*, allegations supported solely by the defendant's receipt of a bonus. *See ECA*, 553 F.3d at 193, 201 (rejecting as insufficient allegations that defendants "had the requisite motive because they received bonuses based on corporate earnings and higher stock prices" and holding that "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated"); *Acito*, 47 F.3d at 54.

The Complaint utterly fails to identify any "unique connection" between the alleged fraudulent statements and a "concrete and personal" benefit to Mr. Peters. Instead, the Complaint merely alleges that, in total, Defendants' collective misconduct increased Nomura's revenue by

over $7 million, but the Complaint makes no attempt to attribute any portion of that total to Mr. Peters' conduct or to the compensation Nomura paid Mr. Peters in the years at issue. Compl. ¶ 52. These allegations fall far short of what the law requires.[12]

### B. The Complaint Fails to Allege Conscious Misbehavior or Recklessness

As the Complaint fails to plead that Mr. Peters possessed the requisite motive to commit fraud, the law demands that the Complaint must "produce a stronger inference" of conscious misbehavior or recklessness. *See SEC v. Syron*, 934 F. Supp. 2d 609, 631-32 (S.D.N.Y. 2013); *Kalnit*, 264 F.3d at 142. This means the Complaint must allege facts from which "a reasonable person would deem the inference of scienter cogent and at least as compelling as any [] opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007).

#### 1. The Complaint Fails to Plead that Mr. Peters Knew or Should Have Known that the Allegedly Misrepresented Facts Were Material

To raise a strong inference of conscious misbehavior or recklessness, the Complaint must demonstrate that "defendants knew or, more importantly, should have known that they were misrepresenting ***material facts*** . . . ." *Novak*, 216 F.3d at 308 (emphasis added). The Complaint fails to allege any set of facts to raise an inference that Mr. Peters either knew or should have known that his statements constituted actionable misstatements of material facts, as opposed to regularly-employed and broadly accepted negotiating tactics. Indeed, the indictment of Jesse Litvak—the sole event to signal to Mr. Peters, Nomura, and the industry that these alleged

---

[12] Notably, at the trial of the parallel criminal action, the highest ranking Nomura employee to testify, Head of Global Markets Americas and Managing Director Jonathan Raiff, testified that it was unlikely that a swing in profits on Nomura's RMBS desk of less than $5 million would have affected a particular trader's compensation. *See* Criminal Action Tr. 5/10/17, 541:5-9 (Raiff: "if the RMBS desk . . . had a profit or a loss of one, two, three, even five million or ***six million dollars, as a practical matter, that type of number doesn't really affect compensation***") (emphasis added).

misstatements were potentially material—occurred *after* the only two trades that the Complaint attributes to Mr. Peters.  And, although the Complaint defines the relevant period here as 2010 through 2013, the Complaint does not allege that Mr. Peters engaged in *any* improper conduct following that high-profile January 2013 indictment.  There is simply no allegation that Mr. Peters misrepresented a single fact once on notice that regulators might view this conduct as improper.

In fact, the Complaint's allegations make clear that, before Mr. Litvak's indictment, Mr. Peters would have thought that the negotiating positions of third parties during RMBS transactions were actively viewed as *immaterial* in the RMBS market.  The RMBS market, as part of securities markets broadly, was regulated with the goal of ensuring the fair disclosure of all material information to investors.  *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 258 (1988) (White, J., dissenting) (noting "the strong preference the securities laws display for widespread public disclosure and distribution to investors of *material* information") (emphasis added).  The Complaint concedes, however, as it must, that "Nomura[] [was] under no obligation to provide information to customers, in connection with their negotiations to purchase and sell RMBS[.]"  *See* Compl. ¶ 24; *see also* 17 C.F.R. 240.10b-10(a)(2)(ii)(A) (dealers who trade as principals must disclose their mark-up in equity trades only, not in trades of debt securities such as RMBS).  The fact that Nomura was under no obligation to disclose information about the negotiating positions of third parties (and, therefore, Nomura's mark-up) makes clear that it was *not* viewed as material in the RMBS market.[13]  More importantly, this industry standard, one not requiring disclosure, shows that Mr. Peters had no reason to view negotiating positions of third parties as material.

---

[13] Further supporting this view of immateriality is the fact that transaction data in the RMBS market was not disseminated to the market.  In 2010, the SEC published in the Federal Register (which may be judicially noticed, per 44 U.S.C. § 1507) approval of FINRA's proposal to begin collecting, *but not disseminating*, RMBS trades.  *See* 75 Fed. Reg. 39, 9262 (Mar. 1, 2010) *available at*

### 2. The Complaint Fails to Plead that Mr. Peters Knew or Should Have Known His Statements Were False or Misleading

For a complaint to "establish scienter in misrepresentation cases, facts must be alleged which particularize how and why each defendant actually knew, or was reckless in not knowing, that the statements were false at the time made." *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 214 (S.D.N.Y. 2004) (quotation omitted). To meet the level of particularity required, "Second Circuit cases uniformly rely on allegations that ***specific*** contradictory information was available to the defendants at the same time they made their misleading statements." *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) (emphasis added). Such a showing, according to the Second Circuit, would demonstrate that "defendants knew or, more importantly, should have known that they were misrepresenting material facts . . . ." *Novak*, 216 F.3d at 308. The Complaint, of course, identifies only two trades executed by Mr. Peters involving an alleged material misstatement, the 2011 Trade and the 2012 Trade, and, in each instance, the Complaint fails to pled with particularity that Mr. Peters knew or should have known of information contradicting his statements. Compl. ¶¶ 47-48.

With respect to the 2011 Trade, the Complaint offers no specific allegations about what Mr. Peters knew or should have known at the time of that trade. Instead, it concludes—without factual support—that "Peters learned that Nomura had purchased a block of the [bond] at 71-08." Compl. ¶ 47. The Complaint alleges that Mr. Peters knew this information when he told the eventual purchaser that the RMBS "was being offered at 75-24, implying that a third party, and not Nomura, owned the bond." *Id.* The Complaint fails to provide any specific details, however,

---

https://www.finra.org/sites/default/files/RuleFiling/p121006.pdf. The SEC and FINRA agreed with groups representing the RMBS industry broadly—the American Securitization Forum and the Securities Industry and Financial Markets Association—that dissemination was not appropriate in 2010. *Id.* at 9263. Nor is such information disseminated today.

as to how Mr. Peters learned Nomura's acquisition cost for this particular RMBS, including, for example, whether he participated in Nomura's negotiation to purchase the security from the seller.

Similarly, with respect to the 2012 Trade, the Complaint alleges Mr. Peters "falsely implied that Nomura was buying the bond at 97-08," because Mr. Peters earlier received an e-mail confirming that "Nomura purchased the block of NAA from the seller at 97-01 . . . ." Compl. ¶ 48. Once again, the Complaint offers no details as to whether Mr. Peters participated in Nomura's purchase of this RMBS, or whether he received and reviewed an email of the type he allegedly received, in the ordinary course.  *Id.*  Because the Complaint fails to allege whether or not Mr. Peters participated in the purchase of the security, it is impossible to assess whether one of the possible non-culpable explanations here—that Mr. Peters received inaccurate information from a fellow trader orally—is at least as compelling as the inference the SEC wishes this Court to draw.

## IV.   MR. PETERS CANNOT BE LIABLE FOR STATEMENTS MADE BY OTHERS

The Complaint seeks to hold Mr. Peters accountable for statements made by others. However, the Supreme Court expressly precludes such a claim.  In *Janus Capital Grp. Inc. v. First Derivative Traders*, the Supreme Court held that a defendant does not violate Section 10(b) if some third party made the allegedly fraudulent statements, unless the plaintiff shows that the defendant exercised some high degree of control over the statement made by the third party, including its content.  *See* 564 U.S. 135, 142 (2011).  This holding is equally applicable to the Complaint's Section 17(a) claim.  *See, e.g.*, *SEC v. Kelly*, 817 F. Supp. 2d 340, 345 (S.D.N.Y. 2011).[14]

---

[14] Numerous courts have held that elements of a Section 17(a) claim are "essentially the same" as those for claims under Rule 10b-5.  *See, e.g.*, *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996).  Further, the Second Circuit has recognized that the SEC's "only purpose" in adopting Rule 10b-5 was to make the same prohibitions contained in Section 17(a)—which applies to the "offer and sale" of a security—applicable to "purchasers" of securities.  *See Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 463 (2d Cir. 1952) (explaining SEC "simply copied" Section 17(a) to create Rule 10b-5).

Here, with respect to misstatements made by third parties, the Complaint alleges that Mr. Peters "trained coached, and directed subordinates to engage in lies and omissions with customers, generating at least approximately $2 million in additional profits to Nomura."  Compl. ¶ 51.  But, critically, besides alleging that Mr. Peters was a "senior trader" at Nomura, the Complaint alleges nothing about his title, his scope of responsibility, or any other fact that might suggest Mr. Peters had the ability to control the statements of others on the RMBS desk.  Indeed, as noted previously, Mr. Peters did not hold the license required to supervise other employees at Nomura.  Consistent with *Janus*, Mr. Peters cannot be held liable for the alleged misstatements made by others when there is no allegations that he was in "ultimate control" of their statements.

## V.  THE SECTION 17(A) CLAIMS FAIL FOR THE SEPARATE REASON THAT MR. PETERS DID NOT OBTAIN MONEY OR PROPERTY

Where, as here, liability under Section 17(a) is premised on "material misrepresentations" (Section 17(a)(2)), the plaintiff is required to plead an additional element: that the defendant obtained "money or property" as a result of the fraud.  *See Kelly*, 817 F. Supp. 2d at 344-45.  The Complaint fails to plead this additional element.  Courts in this circuit have held that it is "not sufficient that a materially untrue statement was made and the person also made money, such as the incidental payment of a scheduled salary and bonus."  *Wey*, 246 F. Supp. 3d at 915; *Syron*, 934 F. Supp. 2d at 637-39 (holding that it is insufficient that a defendant obtain money or property on behalf of his employer).  The Complaint simply does not allege any direct benefit Mr. Peters received as a result of his alleged conduct, suggesting only some indirect link between his conduct and the bonus he received.  As such, the Complaint fails to state a claim under Section 17(a).

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Peters respectfully requests that the Court dismiss the Complaint with prejudice.

New York, New York
October 27, 2017

Respectfully submitted,

**ALSTON & BIRD LLP**

By: */s/ Brett D. Jaffe*
     Brett D. Jaffe
     Joseph G. Tully
     David C. Wohlstadter
     90 Park Avenue
     New York, NY 10016
     Telephone: (212) 210-9493
     Facsimile: (212) 210-9444
     brett.jaffe@alston.com
     joe.tully@alston.com
     david.wohsltadter@alston.com

     *Attorneys for Tyler Peters*