

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/4/18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION, :

                  Plaintiff,      :

            - against -      :

ROSS B. SHAPIRO, MICHAEL A. GRAMINS,  :
and TYLER G. PETERS,

              Defendants.    :
-----------------------------------------------------------------x

15 Cv. 7045 (RMB)

**DECISION & ORDER**

## I.  Background

On September 8, 2015, the U.S. Securities and Exchange Commission ("SEC") filed a

complaint in this Court pursuant to the federal securities laws against Ross B. Shapiro

("Shapiro"), former Managing Director, Fixed Income, at Nomura Securities International, Inc.

("Nomura"); Tyler G. Peters ("Peters"), former Executive Director, Fixed Income, at Nomura;

and Michael A. Gramins ("Gramins"), former Executive Director, Fixed Income, at Nomura

(collectively, "Defendants"). See Complaint, dated Sept. 8, 2015 (hereafter "Complaint").

Defendants are traders who worked at Nomura buying and selling residential mortgage-backed

securities ("RMBS").[1] Id. ¶¶ 1-2. The SEC alleges, among other things, that beginning in or

about January 2010 through in or about November 2013, Defendants "repeatedly lied to, or

otherwise misled, customers about, among other things, the prices at which Nomura had bought

and/or sold RMBS," in violation of Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, and Section 17(a) of the

---

[1] RMBS are a type of security whose underlying assets are residential loans. Complaint ¶ 23. The
residential loans are "typically bundled together, carved into various classes . . . that provide
differing levels of risk and return, and then offered as securities to the investing public." Id.
"RMBS investors receive payments from the interest and principal payments on the underlying
mortgages." Id.

Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a). Id. ¶¶ 4, 9. The SEC also alleges

that Defendants "misled customers about whether they were getting the best price for their

RMBS . . . trades and how much money they were paying Nomura in compensation." Id. ¶ 4.

On September 3, 2015, five days before the SEC filed the Complaint, Defendants were

charged in a ten-count criminal indictment in the U.S. District Court in Connecticut based upon

conduct similar to the conduct alleged in the Complaint.[2] See Indictment, United States v.

Shapiro, 3:15-cr-00155 (D. Conn. filed Sept. 3, 2015), ECF No. 2 ¶¶ 33-40. And, on February 4,

2016, the Government filed a superseding nine-count indictment. See Superseding Indictment,

United States v. Shapiro, 3:15-cr-00155 (D. Conn. filed Feb. 4, 2016), ECF No. 115 ¶¶ 31-38

("Superseding Indictment"). Count One of the Superseding Indictment charged Defendants with

conspiracy to commit wire fraud and securities fraud, in violation of 18 U.S.C. § 371, 15 U.S.C.

§§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5, in that Defendants "conspire[d] . . . to[] devise and

participate in a scheme and artifice to defraud Nomura's victim-customers and to obtain money

and property from them." Superseding Indictment ¶ 31. Counts Two and Three charged

Defendants with securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. §

240.10b-5, in that Defendants "engage[d] in acts, practices, and courses of business that would

and did operate as a fraud and deceit on the purchasers and sellers of [] RMBS." Superseding

Indictment ¶ 36. Counts Four through Nine charged Defendants with wire fraud, in violation of

18 U.S.C. §§ 2, 1343, in that Defendants "knowingly and willfully and with intent to defraud

---

[2] On February 19, 2016, this Court stayed all non-document discovery in this case until "completion of the [parallel] criminal case," and also extended Defendants' time to answer or move with respect to the Complaint "until thirty days following completion of the parallel criminal trial." Order, dated Feb. 19, 2016. On July 14, 2017, approximately one month after the criminal trial, this Court extended Peters' time to answer or move with respect to the Complaint to September 15, 2017. See Order, dated July 14, 2017. On October 12, 2017, this Court further extended the deadline to October 27, 2017. See Order, dated Oct. 12, 2017.

devised and intended to devise a scheme and artifice to defraud . . . Nomura clients purchasing or selling RMBS bonds." Superseding Indictment ¶ 38.

On June 15, 2017, following a two-week jury trial before the Honorable Robert N. Chatigny, Peters was acquitted of all Counts. See Jury Verdict, United States v. Shapiro, 3:15-cr-00155 (D. Conn. filed June 15, 2017), ECF No. 431. Gramins was convicted of Count One; he was acquitted of Counts Two, Four, and Five through Eight; and the jury failed to return a verdict on Counts Three and Nine. Id. Shapiro was acquitted of all Counts except Count One, as to which the jury failed to return a verdict.[3] Id. On June 27, 2017, Gramins and Shapiro moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c)(1); Gramins also moved in the alternative for a new trial pursuant to Federal Rule of Criminal Procedure 33(a). See Motion for Acquittal, United States v. Shapiro, 3:15-cr-00155 (D. Conn. filed June 27, 2017), ECF No. 440. The motions were pending as of June 4, 2018.

At the core of the civil Complaint are alleged "material lies and omissions" of Peters, Shapiro, and Gramins in buying and selling RMBS (bonds) at Nomura, an SEC-registered broker-dealer. Complaint ¶¶ 1, 22. "Shapiro was the head trader on the RMBS desk . . . and supervised the trading conducted by all of the desk's employees, including Gramins and Peters." Id. ¶ 3. Defendants are experienced RMBS traders who worked together before joining Nomura in August 2009. Id. ¶ 23. The SEC also alleges that "[Defendants] trained, coached, and directed subordinates to engage in lies and omissions with customers." Id. ¶ 51.

The SEC alleges that "[f]rom approximately January 2010 through at least approximately November 2013, [Defendants] made misrepresentations to, or otherwise misled, customers on

---

[3] Judge Chatigny declared a mistrial with respect to the Counts as to which the jury failed to return a verdict for Shapiro and Gramins. Transcript of Trial Proceedings, United States v. Shapiro, 3:15-cr-00155 (D. Conn. filed Aug. 17, 2017), ECF No. 470 at 30.

dozens of occasions about the bids and/or offers being provided to Nomura for particular RMBS [bonds] . . . the prices at which Nomura had purchased and/or sold RMBS [bonds] . . . and/or Nomura's compensation for arranging the trade[s]." Id. ¶ 31. The SEC asserts that "[i]n order to negotiate a higher sale price to the customers," Defendants misled customers "into believing that Nomura had paid a higher price for the RMBS [bonds] . . . than it actually had (or was about to)." Id. ¶ 32. "[B]y misrepresenting Nomura's purchase price, [Defendants] misled customers about the amount of compensation Nomura would receive on the transaction." Id. ¶ 33. In many instances, Defendants' alleged misrepresentations were "made in electronic communications such as instant messages, emails, and online chats." Id. ¶ 34.

The SEC describes two allegedly improper transactions in which Peters made misrepresentations to customers. Id. ¶¶ 47-48. First, on March 18, 2011, Peters "falsely claimed that the [RMBS] was being offered at 75-24, implying that a third-party, and not Nomura, owned the bond."[4] Id. ¶ 47. "Peters then elaborated on the misrepresentation, saying that the 'seller' (who did not exist) probably had 'a little room' (meaning, to lower the price) but that the bond's price likely would not fall by more than a point." Id. The customer directed Peters to "fill or kill" or "FOK" (which is industry jargon for "last and final offer"). Id. Peters replied, "FOK worked!" Id. According to the SEC, "[b]y misleading the [customer] about the fictional bid from the phantom seller, Peters extracted over $117,000 in additional profits for Nomura." Id.

---

[4] "There are various quirks to how [RMBS] bond prices are quoted among market participants. First, [RMBS] bond prices are quoted in terms of the price per $100 of face value, not the total price. Second, [RMBS] bond prices that are not whole numbers are represented in 'ticks,' 1/32 of a dollar or approximately $0.03. For example, a bond priced at [$75.75] is represented as [75-24]." United States v. Litvak, 889 F.3d 56, 60-61 (2d Cir. 2018).

Second, on January 12, 2012, a customer asked Peters "point-blank 'so you paid 97-08, right,' and Peters falsely replied 'yes.'" Id. ¶ 48.[5] The SEC alleges that this amount was higher than the actual price, i.e. 97-01, that Nomura had paid for the bond. Id. It is alleged that Nomura earned "over $2,700 in additional profit" by selling this bond. Id.

The SEC alleges that Defendants' "misconduct increased Nomura's revenue by over $7 million." Id. ¶ 52. The SEC also alleges that "[Defendants] trained, coached, and directed subordinates to engage in lies and omissions with customers, generating at least approximately $2 million in additional profits to Nomura." Id. ¶ 51. The additional revenue to Nomura was included in the "qualitative and quantitative factors related to [Defendants'] personal performance and the RMBS desk's performance as a whole" which were used to determine Defendants' bonuses. Id. ¶ 53.

On October 27, 2017, Peters filed a motion to dismiss the Complaint, arguing, principally, that the SEC has failed to demonstrate misstatements, materiality, and scienter, as follows: **(1)** the Complaint fails to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b) because "the entire Complaint purports to describe a pattern of conduct in general terms, without offering any actual detail about the conduct that is alleged to be fraudulent," Def.'s Mem. of Law in Supp. of Def.'s Mot. to Dismiss, dated Oct. 27, 2017 ("Def. Mem."), at 10; **(2)** the Complaint "contains no allegation that any particular investor—let alone the required objective 'reasonable investor'—regarded any alleged misstatement by Mr. Peters to be important to his or her investment decision," id. at 14; **(3)** "The Complaint contains no allegations from which to infer a motive for Mr. Peters to commit fraud because it never

---

[5] A price of 97-08 means that the RMBS was trading at 97.25 percent of its par value. See Complaint ¶ 23.

identifies a direct benefit he received as a result of his alleged conduct," id. at 2; **(4)** the claims

asserted under Securities Act Section 17(a) fail because the Complaint "fails to allege that Mr.

Peters obtained money or property as a result of the alleged misrepresentations," id. at 3; and **(5)**

"Peters cannot be held liable for the alleged misstatements made by other[] [traders] when there

is no allegations that he was in 'ultimate control' of their statements." Id. at 25.

On November 28, 2017, the SEC opposed the motion to dismiss contending, among other

things, that: **(1)** the Complaint "specifically describes the means and methods used by the

defendants to induce customers to pay [] fraudulently inflated prices for RMBS, including: lying

about Nomura's purchase price, misleading customers about Nomura's compensation, . . . and

creating 'phantom sellers' and making up out of whole cloth the 'other side' of an RMBS

negotiation," Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss, dated Nov. 28, 2017

("Opp'n") at 9; **(2)** "even for sophisticated RMBS investors, the trader's representations about

price were an important part of the total mix of information in investment decisions," id. at 14;

**(3)** "Peters had a specific motive to fraudulently inflate profits on the RMBS desk, where the

Complaint alleges that his financial compensation was tied to both his personal performance and

the performance of the RMBS desk overall," id. at 19; **(4)** where "the fraudulent

misrepresentations generated millions in additional income for the firm, it logically follows that

Peters gained money from the fraud for purposes of 17(a)(2) liability, since revenue generation

for Nomura factored into compensation," id. at 24; and **(5)** "[b]y directing other[ Nomura RMBS

traders] to lie to customers and thus artificially inflate profits to Nomura, Peters' conduct also

constituted a scheme for which he is liable . . . ." Id. at 22.

On December 15, 2017, Peters filed a reply. Def.'s Reply Mem. of Law in Supp. of Def.'s Mot. to Dismiss, dated Dec. 15, 2017. Helpful oral argument was held on May 30, 2018. See Hr'g Tr., dated May 30, 2018.

**For the reasons set forth below, Defendants' motion to dismiss the Complaint [#96] is denied.[6]**

## II.    Legal Standard

"'That acquittal on a criminal charge is not a bar to a civil action by the Government, remedial in its nature, arising out of the same facts on which the criminal proceeding was based has long been settled.'" United States v. U.S. Currency in the Amount of $228,536.00, 895 F.2d 908, 916 (2d Cir. 1990) (quoting Helvering v. Mitchell, 303 U.S. 391, 397 (1938)).

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed.R.Civ.P. 9(b) by stating with particularity the circumstances constituting fraud." ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)).

"To survive a motion to dismiss, a complaint must plead enough facts to state a claim to relief that is plausible on its face." Id. (internal quotation marks omitted). "To state a claim for relief under § 10(b) and Rule 10b-5, plaintiffs must allege that [defendants] (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance

---

[6] The Court is not here ruling upon the ultimate merits of either parties' claims or defenses.

Any arguments raised by the parties but not specifically addressed herein have been considered by the Court and rejected.

was the proximate cause of their injury." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d

Cir. 2005) (internal quotation marks omitted).

"On a motion to dismiss, a complaint may not be properly dismissed unless the

misstatements are so obviously unimportant to a reasonable investor that reasonable minds could

not differ on the question of their importance." IBEW Local Union No. 58 Pension Tr. Fund &

Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 390 (2d Cir. 2015) (internal

quotation marks omitted).

"A complaint subject to Rule 9(b) should be allowed to survive a motion to dismiss based

on 'fairly tenuous inferences' of intent, because intent is a fact that a jury should find." S.E.C. v.

One or More Unknown Traders in Sec. of Onyx Pharm., Inc., 2014 WL 5026153, at *4

(S.D.N.Y. Sept. 29, 2014) (quoting In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d

677, 693 (2d. Cir. 2009)).

"[I]t is sufficient under Section 17(a)(2) for the SEC to allege that [a defendant] obtained

money or property for his employer while acting as its agent, or, alternatively, for the SEC to

allege that [a defendant] personally obtained money indirectly from the fraud." U.S. S.E.C. v.

Stoker, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012).

## III.   Analysis

### (1)   The Complaint Sufficiently Pleads Misstatements

The SEC has sufficiently alleged Peters' misstatements to Nomura customers in the

course of negotiating RMBS trades. The Complaint, in alleging the two fraudulent transactions

described at pages 4-5 above, "(1) specif[ies] the statements that the [SEC] contends were

fraudulent, (2) identif[ies] the speaker, (3) state[s] where and when the statements were made,

and (4) explain[s] why the statements were fraudulent." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000).

With respect to the first transaction, the Complaint alleges that: (1) Peters conveyed an offer to a customer "implying that a third-party, and not Nomura, owned the bond;" (2) Peters made the offer directly to the Nomura customer; (3) the misstatement (i.e., that someone other than Nomura owned the bond) occurred on March 18, 2011 in the form of an electronic message; and (4) by relaying a "fictional bid from [a] phantom seller," Peters misled Nomura's customer while purchasing the bond. Complaint ¶ 47. With respect to the second transaction, the Complaint alleges that: (1) Peters told a customer that Nomura had paid 97-08 for an RMBS when, in fact, Nomura had paid the lesser amount of 97-01; (2) Peters conveyed the false amount directly to the customer; (3) the misstatement occurred on January 12, 2012 in the form of an electronic message; and (4) "[a]s a result of Peters' deception, [the customer] believed Nomura had paid 97-08 [rather than the lower amount] and agreed to give Nomura 10 ticks in compensation . . . ." Id. ¶ 48.

These alleged misstatements are sufficiently particularized to satisfy Rule 9(b) requirements. See Sec. & Exch. Comm'n v. Im, 2018 WL 840094, at *1-*3 (S.D.N.Y. Feb. 12, 2018) (where the SEC's complaint provided examples of defendant's misrepresentations about the prices at which Nomura had bought securities, the court found that the SEC had adequately plead misstatements).

### (2)    The Complaint Sufficiently Pleads Materiality

Peters argues that the alleged misstatements were immaterial for two reasons: first, the Complaint "fails to plead anything about the importance of any statements, and certainly fails to allege any particularized facts about how the misrepresentations 'significantly altered the total

mix of information' [available to Nomura's customers]," Def. Mem. at 14 (quoting <u>TSC Indus.,</u>
<u>Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976)); and second, "there is no factual allegation in
the Complaint that explains why the buyer would view the negotiating position or identity of the
seller as a material factor in the buyer's ultimate decision to invest in the security," <u>id.</u> at 16. The
SEC counters (persuasively) that the alleged misstatements were material because "price is a
factor in virtually every investment decision," Opp'n at 13. **And, "*caveat emptor* . . . is not how**
**the securities industry works, as Congress made clear in passing the Securities Act and the**
**Exchange Act."** Opp'n at 17 (emphasis added) (internal quotation marks omitted).

"A misrepresentation is material under Section 10(b) of the Securities Exchange Act and
Rule 10b-5 where there is a substantial likelihood that a reasonable investor would find the
misrepresentation important in making an investment decision." <u>United States v. Litvak</u>, 808
F.3d 160, 175 (2d Cir. 2015) ("<u>Litvak I</u>") (ellipsis and internal quotation marks omitted). "A
misrepresentation is important if there is 'a substantial likelihood that the disclosure of the
omitted fact would have been viewed by the reasonable investor as having significantly altered
the total mix of information made available.'" <u>Id.</u> (quoting <u>Basic Inc. v. Levinson</u>, 485 U.S. 224,
231-32 (1988)). "[M]ateriality is a mixed question of law and fact," which ought not to be
resolved on a motion to dismiss unless the alleged misstatements or omissions are "so obviously
unimportant to a reasonable investor that reasonable minds could not differ on the question of
their importance." <u>ECA</u>, 553 F.3d at 197 (internal quotation marks omitted).

In <u>Sec. & Exch. Comm'n v. Im</u>, a case similar to this one, the SEC alleged that the
defendant, who also worked for Nomura and traded commercial mortgage-backed securities
("CMBS"), had "lied to his customers about the price he had paid for securities he was trying to
resell." 2018 WL 840094, at *1. The defendant moved to dismiss the complaint because

"[CMBS] buyers relied on their detailed market analysis, rather than [defendant's] statements about Nomura's buying price, when making purchasing decisions." Id. at *2. In denying the motion, the court found that the SEC adequately plead materiality:

> For now, it is enough for the SEC to allege that **[1]** [the defendant] misstated Nomura's buying price, **[2]** that the buying price is an important data point in the CMBS industry, and **[3]** that the misstatements affected the price that Nomura's customers were willing to pay. This is why materiality will rarely be dispositive in a motion to dismiss.

Id. at *3 (emphasis added) (citing Litvak I, 808 F.3d at 166, 174, where "a rational jury" could have concluded that defendant's misrepresentations about the costs of acquiring certain RMBS were material).

The SEC's allegations here mirror the allegations the Sec. & Exch. Comm'n v. Im court found were sufficient to plead materiality: (1) Peters misstated Nomura's buying price in a transaction: "Peters' statement falsely implied that Nomura was buying the bond at 97-08 (i.e., 8 ticks below Customer F's 97-16 bid)," Complaint ¶ 48; (2) "participants trading in the RMBS market often seek information concerning the purchase and sale price of RMBS from brokers," id. ¶ 24, and "price was material to Nomura's customers," id. ¶ 7; and (3) Peters' misstatements affected the price Nomura's customers were willing to pay: "Customer F asked Peters point-blank 'so you paid 97-08, right,' and Peters falsely replied 'yes.' . . . . and Nomura [then] sold the securities to Customer F at that price." Id. ¶ 48; see also In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010) (materiality "will rarely be dispositive in a motion to dismiss").

Peters unpersuasively relies upon the Seventh Circuit's decision in United States v. Weimert, 819 F.3d 351 (7th Cir. 2016). That case does not appear to address the allegations presented here, i.e., that Peters' misstatements were deceptions about the price Nomura had paid

for RMBS. See United States v. Litvak, 889 F.3d 56, 67 (2d Cir. 2018) ("Litvak II") ("The value of the [RMBS] may be the most important factor governing the decision to buy, but the price must be considered in determining whether the purchase is deemed profitable. The broker-dealer's profit is part of the price and lies about it can be found by a jury to 'significantly alter the total mix of information . . . available.'" (quoting Basic, 485 U.S. at 232)).

### (3)    The Complaint Sufficiently Pleads Scienter

Peters argues that the SEC failed adequately to plead scienter because "[t]he Complaint contains no allegations from which to infer a motive for Mr. Peters to commit fraud because it never identifies a direct benefit he received as a result of his alleged conduct." Def. Mem. at 2. The SEC responds persuasively that the Complaint adequately alleges scienter because "Peters had a specific motive to fraudulently inflate profits on the RMBS desk, where the Complaint alleges that his financial compensation was tied to both his personal performance and the performance of the RMBS desk overall." Opp'n at 19.

"In order to plead scienter, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind[.]" Novak, 216 F.3d at 311 (internal quotation marks omitted). "A strong inference of fraudulent intent may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." IKB Int'l S.A. v. Bank of Am. Corp., 584 Fed. App'x 26, 27-28 (2d Cir. 2014) (internal quotation marks omitted).

The Complaint adequately pleads scienter, as follows: First, the SEC alleges that Peters had the requisite motive and opportunity to commit the alleged fraud because Nomura determined Peters' compensation based, in part, upon the amount of revenue he generated. See

Complaint ¶ 53. In other words, Peters would receive a personal benefit (in the form of his compensation) as a result of misstatements to customers as to the cost Nomura had paid for RMBS bonds. See id. This causal relationship (or "direct link") between Peters' compensation and the alleged fraudulent statements is enough to show that Peters had the motive and opportunity to commit the alleged fraud. See Im, 2018 WL 840094, at *3 (quoting ECA, 553 F.3d at 201).

Second, and alternatively, the Complaint adequately alleges facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 177 (2d Cir. 2015) (it is "sufficient to state a claim based on recklessness if the complaint 'specifically alleges defendants' knowledge of facts or access to information contradicting their public statements" (quoting Novaks, 216 F.3d at 308)). The Complaint alleges that over a four-year period, Peters "misled and lied" to Nomura customers about, among other things, (i) the prices at which Nomura had bought or sold the securities; (ii) the bids and offers that Nomura made or received on the securities; (iii) the compensation that Nomura would receive for intermediating the trades in the form of the "spread;" and (iv) who owned the security, including the allusion to third party sellers when Nomura had, in fact, already acquired the security. Complaint ¶¶ 4, 47-48, 55, 58; Opp'n at 20.

### (4)   The Complaint Sufficiently Pleads 17(a) Liability

Peters argues that the SEC's Section 17(a) claim fails because the Complaint "fails to allege that Mr. Peters obtained money or property as a result of the alleged misrepresentations." Def. Mem. at 3. The SEC responds persuasively that where "the fraudulent misrepresentations generated millions in additional income for the firm, it logically follows that Peters gained

13

money from the fraud for purposes of 17(a)(2) liability, since revenue generation for Nomura factored into compensation." Opp'n at 24.

"Many courts—including the Second Circuit—analyze claims under both [Section 17(a) and Section 10(b)] together." <u>S.E.C. v. Constantin</u>, 939 F. Supp. 2d 288, 302-03 (S.D.N.Y. 2013) (internal quotation marks omitted); <u>see also</u> <u>SEC v. Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999). Where, as here, liability under Section 17(a) is premised upon material misrepresentations in the offer or sale of a security, the SEC is required also to plead that the defendant obtained "money or property" as a result of the fraud. <u>See</u> <u>S.E.C. v. Kelly</u>, 817 F. Supp. 2d 340, 344-45 (S.D.N.Y. 2011) (Section 17(a)(2) of the Securities Act provides that it is unlawful "for any person in the offer or sale of securities . . . directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact.").[7]

There is a split of authority in this District as to whether a defendant must obtain money or property on behalf of his employer in order to violate Section 17(a)(2), or whether a defendant "must personally gain money or property from the fraud." <u>Compare</u> <u>Stoker</u>, 865 F. Supp. 2d at 463 ("It would be contrary to th[e] language [of Section 17(a)], and to the very purpose of Section 17(a), to allow a corporate employee who facilitated a fraud that netted his company

---

[7] "As with Rule 10b-5, subsections (1) and (3) of Section 17(a) apply to scheme liability and subsection (2) applies to misstatement liability." <u>Kelly</u>, 817 F. Supp. 2d at 345. The SEC in this case is proceeding under Section 17(a)(2) for Defendant's alleged misstatements or misrepresentations and under Sections 17(a)(1) and (3) for "scheme liability." <u>See</u> Discussion at pp. 15-16.

In the Complaint, the SEC pleaded that Defendants are liable under Sections 10(b) and 17(a), without specifying which subsection(s) applied to the alleged conduct. Complaint ¶¶ 56, 59. In his motion to dismiss the Complaint, Peters asserts that the SEC pleaded only misstatement claims. Def. Mem. at 25. The SEC counters that "[t]his is not only a 'misstatements and omissions' case." Opp'n at 22. "Peters conduct also constituted a scheme for which he is liable under . . . 10b-5(a) and (c), and . . . 17(a)(1) and (3)." <u>Id.</u>

millions of dollars to escape liability for the fraud by reading into the statute a narrowing requirement not found in the statutory language itself.") with SEC v. Syron, 934 F. Supp. 2d 609, 640 (S.D.N.Y. 2013) ("[the requirement that] the defendant personally gains money or property from the fraud is essential, for otherwise the defendant may have fraudulently induced the victim to part with money or property, but he has not obtained that money or property himself").

This Court agrees with and adopts the reasoning in the Stoker case, i.e., that "it is sufficient under Section 17(a)(2) for the SEC to allege that [the defendant] obtained money or property for his employer while acting as its agent, or, alternatively, for the SEC to allege that [the defendant] personally obtained money indirectly from the fraud." 865 F. Supp. 2d at 463. The Complaint pleads both that Peters obtained money for his employer and personally obtained money indirectly from the fraud. See Complaint ¶¶ 47-48, 50-53. For example, the SEC alleges that in one transaction, "[b]y misleading [a customer], . . . Peters extracted over $117,000 in additional profits for Nomura," and in another transaction, that "[a]s a result of Peters' deception, . . . . Nomura [] earned . . . over $2,700 in additional profit." Id. ¶¶ 47-48. The SEC also alleges that since "Nomura determined [Peters'] bonus[] based on a variety of qualitative and quantitative factors, . . . which included revenue generation," a portion of Peters' personal compensation (which totalled $2.9 million between approximately January 2010 and November 2013) was earned based upon the revenue he generated through his fraudulent statements. Id. ¶¶ 52-53; see also page 13 supra.

### (5)    Scheme Liability Need Not be Determined

As noted, the SEC argues, alternatively, that "Peters' conduct also constituted a scheme

for which he is liable under . . . Rules 10b-5(a) and (c), and . . . Sections 17(a)(1) and (3)," because he "direct[ed] other[ Nomura RMBS traders] to lie to customers and thus artificially inflate profits to Nomura." Opp'n at 22.

Because the Court has determined that the SEC has adequately plead misstatement liability against Peters under Section 10b–5(b) and 17(a)(2), see pages 9-15 supra, it need not address scheme liability. See In re Alstom SA, 406 F. Supp. 2d at 475 ("[B]ecause the Court has already determined that Plaintiffs have successfully stated a claim for liability under Section 10(b) against [defendants] for the misleading statements made with regard to the [alleged fraud], it need not address the potential applicability of scheme liability under subsections (a) and (c) to this fraud.").

## IV.    Conclusion & Order

For the reasons stated above, Peters' motion to dismiss [#96] is denied.

A status conference is scheduled for June 21, 2018, at 9:30 a.m.

Dated: June 4, 2018
New York, New York

**RICHARD M. BERMAN**
**U.S.D.J.**

16